11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Kevin Lynz Cross a/k/a Kevin Lindsay Cross

Appellant

Vs.                   Nos.  11-02-00352-CR & 11-02-00353-CR B Appeals from Palo Pinto County

State of Texas

Appellee

 

In Cause
No. 11-02-00352-CR, the jury convicted appellant of the capital murder of Emma
London, and the trial court assessed punishment at confinement for life.  In Cause No. 11-02-00353-CR, the jury
convicted appellant of the capital murder of Francis Hodges, and the trial
court assessed punishment at confinement for life.  We affirm.

Appellant
brings identical complaints in each appeal. 
In his first point of error, appellant contends that the evidence is
legally insufficient to support his convictions.  In order to determine if the evidence is legally sufficient, we
must review all of the evidence in the light most favorable to the verdict and
determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307 (1979); Jackson v. State, 17
S.W.3d 664 (Tex.Cr.App.2000).  In his
third point of error, appellant complains that the trial court erred in
including an instruction on the law of parties in the jury charge.








Eighty-year-old
Emma London and her 75-year-old sister, Francis Hodges, were found murdered in
the house that they shared on June 30, 1983. 
Jerry White, the current Chief of Police in Mineral Wells, testified at
trial that, at the time of the offense, he was a detective for the Mineral
Wells Police Department.  Chief White
was dispatched to the residence concerning a homicide between 9:00 and 9:15
a.m.  Chief White stated that, when he
and the other officers entered the residence, it was in disarray and that the
two victims were found lying on the kitchen floor.  Chief White said that appellant became a suspect during the
initial investigation.  Palo Pinto
County Sheriff Larry Watson testified at trial that the actual investigation of
the case lasted about six months. 
Sheriff Watson stated that the Ainvestigation [had] been off and on over the last 19 years.@  

Clyde L.
Evans contacted the Palo Pinto County District Attorney=s office in 2000, claiming that he had
information concerning the 1983 murders. 
Evans testified at trial that, in 1983, he came in contact with
appellant a few months after the murders. 
Evans met appellant at the park in relation to a Adrug deal.@  Evans stated that appellant
began telling him about the murders of two elderly ladies.  Appellant told Evans that Athere was blood splattered everywhere@ in the house.  Evans told appellant that he did not want to know about the
murders. Appellant then started crying, but Evans again told him that he Adidn=t want to hear nothing else about the murders.@ 

Evans
testified that, in the summer of 1984, he again came into contact with
appellant.  Appellant went to Evans=s home and wanted to trade two rings for
drugs.  Evans said that the rings were
platinum with large diamonds in them. 
One ring had an AH@ engraved in the band.  Evans gave appellant an Aeightball of methamphetamine for the rings.@ 
Appellant told Evans not to get rid of the rings in town and that the
rings came from the murders of the two elderly ladies.  Appellant told Evans that he had a lot more
jewelry from the house, and Evans told appellant to bring the jewelry  to him when appellant was ready to sell it. 

Rosalyn
Annette Berkins testified that appellant came to her house at approximately
11:30 p.m. on June 29, 1983.  Berkins
and appellant Adid some drugs.@  Around midnight, Gerald Taylor
and Adrian Wright also came to Berkins=s house, and appellant went outside to talk to them.  Berkins testified that she overheard them
say that someone would have the back door open and that Athey was going to rob some ladies.@ 
Appellant, Taylor, and Wright left Berkins=s house around 12:30 a.m., and Berkins went to bed.








Berkins
said that appellant returned to her house around 2:00 a.m.  After having sexual relations with
appellant, Berkins turned on the light and saw blood on the bottom of appellant=s shirt. 
Berkins testified that Taylor and Wright returned to her house around
3:00 a.m. and that they argued with appellant about how to get rid of some
jewelry.  Berkins stated that Wright had
three or four Abig-sized@ rings on her finger.  Berkins
said that all three were acting nervous. 
Appellant took off the bloody shirt and put it in a bag; and he took the
bag when he, Taylor, and Wright left Berkins=s house.  Berkins testified that
she went back to bed and that, when she got up that morning, she noticed blood
on her pillowcases.   Berkins took the
pillowcases to her mother=s house.  After she realized
that the two victims had been killed, she took the pillowcases to the police
station. Tests conducted on the pillowcases revealed that blood type O and
blood type B positive were present on the pillowcases. The record shows that
the victims both had type O blood and that appellant had B positive blood. 

Tinker
Haney testified at trial that she and appellant lived together for
approximately eight years beginning in 1984. 
Haney said that in 1988 she found a bloody pillowcase, a bone, and a
ring in the bottom of the closet.  Haney
told appellant what she had found, and the two began fighting.  Haney told appellant to Ajust go ahead and kill me@ because she knew Ahe had killed those ladies.@ 
Haney said that appellant hit her in the head and told her that he would
kill her Athe same way he had killed them.@

Raymond
Travis Poole testified that he was released from prison in September 1983 and
that he Amet up@ with appellant.  Poole
testified that appellant asked if Poole was sure he wanted to be around
appellant because of the murders of the two ladies.  Appellant told Poole that he, Taylor, and Curtis Mayfield were
arguing because appellant had gotten Amessed out of some of the money.@  Poole said that appellant
showed him some rings and asked Poole where he could get rid of them.   One of the rings had AF. Hodges@ engraved in it.  Poole kept the
rings for a while but later returned them to appellant.   Poole told appellant to pawn the ring, and
appellant responded that Aif he did, they would probably throw him under the jail.@








The
indictments allege that appellant caused the death of each victim by hitting
the victim with a pipe and that appellant was in the course of committing or
attempting to commit the offense of burglary. 
The charge in each case authorized the jury to convict appellant if they
found that he caused the death of the victims by hitting them with a pipe while
in the course of committing burglary. 
The charge also authorized the jury to convict appellant if it found
that Taylor or Wright caused the death of the victims by hitting them in the
head with a pipe while in the course of committing burglary and that appellant Aacted with intent to promote or assist the
commission of the offense by...soliciting, encouraging, directing, aiding, or
attempting to aid@ in
the commission of the offense of capital murder.  The charge also contained an issue on the use of a pipe as a
deadly weapon.  The jury found that
appellant did not use or exhibit a deadly weapon during the commission of the
offense. 

Appellant
argues that the trial court erred in including in each charge an instruction on
the law of parties.  At the charge
conference, the State requested a charge on the law of parties. The trial court
initially denied the request. The trial court took the matter under advisement
and later determined that Athere is sufficient evidence to raise the issue of the [appellant]
acting with the intent to promote or assist the commission of the offense by
Gerald Taylor or Adrian Wright.@ 

The law of
parties may be applied to a case even though no such allegation is contained in
the indictment. Jackson v. State, 898 S.W.2d 896, 898 (Tex.Cr.App.1995); Barnes
v. State, 62 S.W.3d 288 (Tex.App. - Austin 2001, pet=n ref=d).   An instruction on the law
of parties may be given to the jury whenever there is sufficient evidence to
support a jury verdict that the defendant is criminally responsible under the
law of parties. Ladd v. State, 3 S.W.3d 547, 564 (Tex.Cr.App.1999), cert.
den=d,  529 U.S. 1070 (2000).  In determining whether a defendant
participated as a party in the commission of an offense, the fact finder may
look to events that occurred before, during, or after the offense and may place
reliance on acts showing an understanding and common design.   Ransom v. State, 920 S.W.2d 288, 302
(Tex.Cr.App.), cert. den=d,  519 U.S. 1030 (1996).  An agreement of the parties to act together
in a common design can be shown by either direct or circumstantial evidence.  Burdine v. State, 719 S.W.2d 309, 315
(Tex.Cr.App.1986), cert. den=d,  480 U.S. 940 (1987).   The State must show more than mere presence
to establish participation in a criminal offense.  See Valdez v. State, 623 S.W.2d 317, 321 (Tex.Cr.App.1981);
Barnes v. State, supra.  Mere presence
or even knowledge of an offense does not make one a party to the offense.  See 
Oaks v. State, 642 S.W.2d 174, 177 (Tex.Cr.App.1982); Barnes v. State,
supra.  However,  mere presence is a circumstance tending to
prove that a person is a party to the offense and, when taken with other facts,
may be sufficient to show that he was a participant.  Barnes v. State, supra.   








Berkins
testified that she overheard appellant, Taylor, and Wright discussing a plan to
Arob some ladies.@ 
Berkins stated that later that night appellant returned with blood on
his shirt, and he, Taylor, and Wright were arguing about some jewelry and how
to get rid of the jewelry.  Wright had
three or four large rings.  There was
also evidence that appellant tried to tell Evans about the murders.  Appellant indicated to Evans that he had
been inside of the house and that a lot of blood had splattered
everywhere.  Appellant later traded two
rings with Evans for drugs.  One of the
rings had the initial AH@ inside of the band.  Appellant said that the ring came from the
murders of the two elderly ladies. 

Appellant
told Poole that Athey@ had been in trouble because of the murders of the two elderly
ladies.  Appellant told Poole that he
was involved in the murders.  Appellant
said that he and Taylor were arguing about the property taken in connection
with the murders. Poole recalled a discussion involving appellant and some
other guys about who had killed the elderly women.  Poole said that  appellant
never denied being involved in the murders.   
We find that the trial court did not err in including the charge on the
law of parties.  Appellant=s third point of error is overruled.

 Appellant contends that, because the jury
found that he did not use a deadly weapon in the commission of the offense, the
jury convicted him under the law of parties. 
Appellant contends that the evidence is legally insufficient to show
that he encouraged or directed Taylor and Wright to commit the offense of
capital murder.  Viewing all of the
evidence in the light most favorable to the verdict and having found the
evidence supported a charge on the law of parties,  we find that the evidence is legally sufficient to support
appellant=s convictions.  Appellant=s first point is overruled.








In his
second point, appellant complains that the trial court erred in denying his
motion for continuance.  On August 30,
2002, the trial court granted appellant=s first motion for continuance and set the case for trial on November
4, 2002.  On October 30, 2002, appellant
filed his second motion for continuance. 
In his second motion for continuance, appellant stated that Texas Ranger
Billy Peterson, one of the original investigators in the case, had recently
suffered a heart attack and would be unable to attend the trial.  Appellant requested a continuance for Aso long as is necessary for Mr. Peterson to
recover and be able to testify.@   A trial court's ruling on a
motion for continuance is reviewed for abuse of discretion.  Janecka v. State, 937 S.W.2d 456, 468
(Tex.Cr.App.1996), cert. den=d,  522 U.S. 825 (1997);  Heiselbetz v. State, 906 S.W.2d 500
(Tex.Cr.App.1995).   To establish an
abuse of discretion, there must be a showing that the defendant was actually
prejudiced by the denial of his motion. 
Janecka v. State, supra.  

At the
hearing on appellant=s
motion for continuance, the State noted that there were three investigators
involved in the case and that there was no indication Texas Ranger Peterson
would offer evidence that could not be provided by the other two
investigators.  At trial, Chief White
stated that he had reviewed Texas Ranger Peterson=s report which speculated that the offense occurred between 8:30 a.m.
and 12:00 p.m on June 29.  Chief White
could either agree or disagree with Texas Ranger Peterson=s time frame for the offense.  Sheriff Watson also testified at trial that
he was familiar with Texas Ranger Peterson=s report.   Sheriff Watson
reviewed the report at trial and stated that Texas Ranger Peterson was of the
opinion that the offense occurred between 8:30 a.m. and 12:00 p.m. on June
29.  Sheriff Watson stated that he was
unable to agree or disagree with Texas Ranger Peterson=s opinion. 
Sheriff Watson later testified that he believed the offense occurred
during the early morning hours of June 30. 
The record shows that two of the original investigators testified at
trial.  Both reviewed the report of
Texas Ranger Peterson and noted his opinion as to the time of the offense.  There is no indication Texas Ranger Peterson
would have added any further details had he testified at trial.  Appellant has not shown that the trial court
abused its discretion in denying his second motion for continuance.  Appellant=s second point is overruled.  

In his
fifth point, appellant argues that the trial court erred in denying his motion
to dismiss.  On April 10, 2002,
appellant filed a motion to dismiss claiming that the State had not exercised
due diligence in preparing for trial and had violated appellant=s right to a speedy trial pursuant to the
United States and Texas Constitutions. 
The motion also stated that the State was ordered to file its notice of
intent to seek the death penalty no later than January 11, 2002, and that the
State had failed to file the notice of intent.  The motion further claimed that the State had failed to provide
discovery items as required by the trial court.








The trial
court held a hearing on appellant=s motion to dismiss on April 25, 2002. 
On the day of the hearing, the State provided appellant with a discovery
packet.   The State also filed notice
that it would not seek the death penalty. 
The State argued at the hearing that the delay in providing the discovery
material was due to the fact that they were waiting on information from the
Department of Public Safety Crime Lab and on some internal investigation from
the sheriff=s department.  The State noted that appellant was not deprived of his liberty
while awaiting trial because he was in the county jail on a bench warrant from
another institution.

In
determining whether an accused has been denied his right to a speedy trial, a
court must use a balancing test in which the conduct of both the prosecution
and the defendant are weighed.  Barker
v. Wingo, 407 U.S. 514, 530 (1972); Dragoo v. State, 96 S.W.3d 308
(Tex.Cr.App.2003).  The factors to be
weighed in the balance include, but are not necessarily limited to, the length
of the delay, the reason for the delay, the defendant=s assertion of his speedy trial right, and
the prejudice to the defendant resulting from the delay.  Barker v. Wingo, supra, Dragoo v. State,
supra.  No single factor is necessary or
sufficient to establish a violation of the right to a speedy trial.  Barker v. Wingo, supra, Dragoo v. State,
supra.

The record
shows that appellant was indicted for the offense on August 14, 2001, and the
trial  began on November 4, 2002.  The cause was initially delayed as the State
was awaiting information from other agencies. 
Appellant then filed a motion for continuance on August 15, 2002, and
the cause was reset for November 4, 2002. 
Appellant filed another motion for continuance on October 30, 2002.  Appellant was not subjected to oppressive
pretrial incarceration because he would have been incarcerated at another
institution.  We find that the trial
court did not err in denying appellant=s motion to dismiss.  Appellant=s fifth point is overruled.

In his
fourth point on appeal, appellant complains that the trial court erred in
failing to exclude hearsay testimony. 
On redirect examination, the State asked Sheriff Watson if he was aware
of where the victims kept their money. 
Appellant objected to Aanything he might have been told.@  The trial court overruled the
objection Asince [appellant] opened the door by having
their [the victims=]
routine come in through the nephew=s report.@  Sheriff Watson went on to testify that the
victims kept their money in a money belt and that the money belt was not
recovered. 








On
cross-examination, appellant asked Sheriff Watson about information in Texas
Ranger Peterson=s report. 
Appellant asked if Texas Ranger Peterson talked to individuals who knew
the victims= routine. 
Sheriff Watson reviewed Texas Ranger Peterson=s report, and then appellant asked, AAnd he also indicated that he - - I believe
he talked to a cousin of the victims that related basically what the routine
was, right?@ 
Sheriff Watson answered AYes@ and said that the report indicates Ayou can set the clock by it.@  We
find that any error in admitting the testimony did not have a substantial and
injurious effect or influence in determining the jury=s verdict. 
TEX.R.APP. P. 44.2(b); King v. State, 953 S.W.2d 266, 271
(Tex.Cr.App.1997).  There was  evidence that appellant had jewelry belonging
to the victims which allowed the jury to find that the murder had occurred
while in the course of committing burglary. 
Appellant=s fourth point is overruled.

In his
sixth point, appellant argues that the trial court erred in admitting
inflammatory and prejudicial photographs. 
During the direct examination of the medical examiner, the State sought
to introduce the autopsy photographs of the victims.  Appellant objected, stating that the photographs were Aextremely gruesome@ and would be prejudicial to his case.   The admissibility of photographs is within
the sound discretion of the trial judge. Chamberlain v. State, 998 S.W.2d 230,
237 (Tex.Cr.App.1999), cert. den=d, 528 U.S. 1082 (2000).  In
determining whether the probative value of the photographs is substantially
outweighed by the danger of unfair prejudice, the court may consider the number
of exhibits offered, their gruesomeness, their detail, their size, whether they
are in color or in black and white, whether they are close‑up, and
whether the body depicted is clothed or naked. 
Hayes v. State, 85 S.W.3d 809, 815 (Tex.Cr.App. 2002); Wyatt v. State,
23 S.W.3d 18, 29 (Tex.Cr.App.2000). 
Autopsy photographs are generally admissible unless they depict
mutilation of the victim caused by the autopsy itself.  Hayes v. State, supra.  

Nine
autopsy photographs of each victim were admitted.  The photographs depict the victims= injuries.  The medical examiner
referred to the photographs in describing the victims= injuries. 
We find that the trial court did not abuse its discretion in admitting
the photographs.  Hayes v. State,
supra.  Appellant=s sixth point is overruled.

The
judgments of the trial court are affirmed.

 

PER
CURIAM

 

May 22, 2003

Do not publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of: Arnot, C.J., and

Wright, J., and McCall, J.