COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-175-CV

 

 

IN THE MATTER OF J.B.C.                                                                    

 

                                                                                                        

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.  Introduction

In three issues, Appellant
J.B.C. appeals the trial court=s decision that he engaged in delinquent conduct by committing
murder.  We affirm.

II.  Factual and Procedural Background








In spring 2005, Kris Lee
opened up her home to care for her two grandsons (ages nineteen and sixteen)
while their mother, Lee=s daughter,
was in prison for aiding and abetting a drug offense.  Not having had the opportunity to get to know
either boy, Lee saw the opportunity as a new lease on life.  On July 6, 2005, Lee was found dead on her
bedroom floor from a single gunshot wound to the back of her head. 

The State presented a great
deal of circumstantial evidence against J.B.C. at trial, from which the jury
found beyond all reasonable doubt that J.B.C. had engaged in delinquent conduct
by committing murder.

A.  Introduction

Michael C.[1],
the older of Lee=s two
grandsons, arrived first and did not present Lee with many problems.  It was after J.B.C. arrived that family
members and neighbors indicated that problems arose.  By all accounts, including the testimony of
J.B.C. himself, J.B.C. was disrespectful to his grandmother and her home.  He cussed at and argued with her.  He trashed her house, broke her belongings,
and essentially confined her to living in her bedroom.  He smoked marijuana in her presence, and he
used methamphetamines in her home. 

B.  Events of July 6, 2005








On the morning of July 6,
2005, Michael was playing video games with Shawn Franks, Jeremy Bonsignore, and
Bryan Frailey at Franks=s house,
which was just down the street from the home Lee shared with her
grandsons.  The boys decided to go to Lee=s house to get J.B.C. and his video game, AMadden 2005,@ so that
together they could return to Franks=s house to smoke some pot and play the video game.  Upon arriving at the house, the four boys
went to the back door.  After banging on
the door and getting no immediate answer, Michael went around to the front
door.  The other three boys stayed at the
back door.  With a Aghostly look@ on her
face, Lee eventually answered the back door and, without saying a word, let the
boys in the house.  Lee immediately went
back down the hallway towards her bedroom. 

Apparently the noise created
by the four boys as they came in the house awakened J.B.C., who had been asleep
on the living room couch.  J.B.C. used
the living room as his bedroom.  One of
the boys informed J.B.C. that his pot plant was missing from the backyard.  Frailey testified that he heard J.B.C. mutter
angrily AI bet my fucking granny did it@ referring to the missing pot plant. 
J.B.C. admitted at trial that he had said he thought his Afucking granny did it.@ 








J.B.C. got up from the couch
and went down the hall to go get dressed. While J.B.C. was out of the room
getting dressed, the other four boys remained in the living room and watched
T.V. while waiting for J.B.C. to return clothed and with the video game.[2]  None of the boys heard any unusual sounds or
a gunshot while J.B.C. was down the hallway, though Frailey testified that he
heard what may have been a door shutting. 

J.B.C. testified that after
waking up, he went to Michael=s room and took no more than two minutes getting dressed before
returning to the living room with the video game in hand.  Then, J.B.C. testified, he and Franks walked
back down the hallway to Lee=s bedroom so that he could tell his grandmother that he was
leaving.  According to J.B.C., he entered
his grandmother=s bedroom,
found a note on the bed, and read it as he walked back out to the living
room.  Written in several different ink
colors, the note read: 

Dear
Jake and Josh, 

 

Do
not think this is your fault, I=m just so tired of seeing
people hurt peopleCespecially
family. I can=t
believe my own family can believe the lies someone is making up about me. Hope
you have a wonderful life. 

 

Love
always, 

Granny


xoxoxo


 

P.S.
Josh: I told you I had somewhere better to go!

 








Realizing that she may have been referring to Aheaven@ and
committing suicide when she said Asomewhere better to go,@ J.B.C. said he ran back to Lee=s room.  He first searched his
grandmother=s closet
before finding her face down on the other side of the bed.  A handwriting analyst determined that Lee in
fact wrote the note.  J.B.C.=s prints were not among the suitable latent fingerprints found on the
note. 

In contrast to J.B.C.=s account, as detailed above, the testimony of Frailey, Bonsignore,
and Franks adduced at trial supports the theory that J.B.C. was absent for more
than the two minutes he claimed, and that Michael was the one who found and
initially read the alleged Asuicide note.@ 

According to Frailey, after
J.B.C. spent about ten minutes down the hall, he went outside and messed around
with a metal bucket.  Frailey also
testified that it was he who followed Michael down the hallway to Lee=s room while J.B.C. was, he guessed, still outside.  Michael discovered the note on Lee=s bed and said that he needed to show it to J.B.C.  Michael and Frailey walked back out to the
living room to show J.B.C. the note. 
J.B.C. responded that his grandmother hadn=t left, she was hiding.  J.B.C.
denied at trial ever saying that he thought she was hiding.  Frailey testified that everybody then
followed J.B.C. down the hall to Lee=s bedroom.








Similarly, according to
Bonsignore, the next time he saw J.B.C., J.B.C. was coming inside through the
back door with his dog.  After coming
back inside, J.B.C. washed his hands in the kitchen sink.  Bonsignore testified that he did not know how
J.B.C. had gotten outside.  He further
testified that Michael and Frailey went down the hallway while he was in the
kitchen talking to J.B.C.  Michael came
back out reading a note he found in Lee=s bedroom.  Commenting that the
letter sounded serious, Bonsignore testified that Frailey looked out the window
to see that Lee=s car was
still in the driveway.  Everyone except
for Bonsignore went down the hallway to Lee=s bedroom. 

According to Franks, J.B.C.
was the only one who had left the living room, and he spent about three to five
minutes down the hallway.  However, he
too identified Michael as the one who returned with the note in his hands. At
trial, Franks could not explain how Michael had gotten the note, or say for
certain that Michael had actually been in the living room the entire time. 








The boys found Lee=s body face down between the wall and the side of the bed.  J.B.C. testified that he screamed AGranny, Granny, Granny@ a couple of times, and after getting no response, he ran out of the
bedroom.  J.B.C. said that he did not try
to do anything to help her because he was scared.  When J.B.C. said that his grandmother was
dead and had killed herself, everyone got out of Lee=s house.  J.B.C. then ran to the
neighbor=s house, screaming that his granny was dead, and asked that they call
the police.  Bonsignore testified that he
told the grand jury that J.B.C. said AI think my granny shot herself.@  J.B.C. denied saying that he
told anyone he thought his grandmother shot herself.         James Ludwick, Lee=s neighbor, went to the house to help. 
He found Lee=s body
behind the bed.  When he tried to lift
her, a gun came out from underneath her body. 
Not until the paramedics arrived and turned Lee=s body over did Ludwick remember seeing any blood. 

Paramedics arrived on the
scene within minutes of being dispatched to what they believed was a cardiac
arrest.  It was only after paramedic Todd
Farmer turned over Lee=s body that
he saw that her hair was matted with blood and brain matter was running from
her nose.  Her skin was still warm to the
touch.  Paramedics phoned doctors at
Harris Hospital and had Lee pronounced dead on the scene. 

C.  The Autopsy








Medical examiner Dr. Gary
Sisler performed the autopsy on Lee=s body on July 7, 2005.  Dr.
Sisler testified that Lee had a bruise on the outside of her right forearm, a
bruise on her right optical orbit, and a laceration and gunshot wound to the
back of the right side of her head.  The
bruise on her arm was consistent with a defensive wound.  The laceration matched the butt of the gun in
size.  In fact, it was Dr. Sisler=s assessment that the gun was a possible cause of the laceration.  Still at that point, Dr. Sisler testified, he
could not rule out suicide.  However,
once Dr. Sisler pulled back the skin from Lee=s scalp, he discovered wounds separate from the gunshot wound that led
him to rule out suicide as a cause of death. 
He observed a bruise over the left side of the head and fractures of the
sagittal suture that were not visible before pulling back the scalp.  One skull fracture, approximately five
centimeters in length, was in the middle of the back of the head and extending
upwards.  The second fracture was on the
right occipital bone at the base and measured eight centimeters in length.  Dr. Sisler did not believe that either of
these fractures resulted from the gunshot wound.  Furthermore, extensive hemorrhaging showed
that the injuries occurred while Lee had blood pressure and was, therefore,
alive.  Dr. Sisler determined that while
the cause of death was a single gunshot wound to the head, the additional
injuries Lee had suffered indicated that the manner of her death was homicide. 

D.  The Investigation








        Detective John Pringle, who assessed the
scene of the crime, surmised that Lee had been living in her cluttered bedroom
because the house looked like it had been turned over to Michael and
J.B.C.  Detective Pringle recovered from
Lee=s bedroom a .32 Smith and Wesson long caliber revolver, which had been
cleaned throughly on the outside, leaving no fingerprints.  No blood or tissue was found on the gun.  Lee, Michael, Bonsignore and J.B.C.=s hands were all tested for gunshot residue, but each of them came
back negative.  However, laboratory
testing revealed that the gun tended not to deposit particles of significant
quantities on the hand of any person who fired it.  Detective Pringle also did not find any blood
spatter on the ceiling or walls. 
However, he testified that the Lake Worth Police Department did not have
the chemicals necessary to check for blood spatter that was not otherwise
visible to the naked eye. 

Detective Pringle testified
that even before the autopsy he did not believe that Lee=s cause of death was a suicide. 
The scene was odd, and the victim had suffered a single gunshot wound to
the head.  After the autopsy, however, he
was sure Lee=s death was
a homicide.  Detective Pringle further
testified that he spoke with Lee=s family about suicidal tendencies, and he found nothing suggesting
that she was suicidal. 








Pastor Frank Briggs, who had
known Lee since 1997, testified that there was no way Lee had committed
suicide.  Similarly, Lee=s sister, Colleen Hendrix, did not believe that Lee had committed
suicide because Lee believed that a person who committed suicide could not go
to heaven.  Hendrix also testified as to
finding in Lee=s house a
Big Lots receipt time-stamped less than two hours before her death, a completed
driver=s license renewal, and a fresh rice casserole on the stove, all of
which led to the conclusion that Lee had not committed suicide.  However, Dawn C., Lee=s daughter and the mother of Michael and J.B.C., initially said that
she was neither shocked nor surprised Lee had taken her own life.  Dawn later said that she was surprised that a
person as deeply religious as Lee would commit suicide. 

Additional testimony was
elicited from Susan Locke, the daughter of Charles Lee, Lee=s late husband.  According to
Locke, Charles=s family was
happy that he had married Lee.  No one
blamed Lee for his heart attack fifteen years earlier nor had any hostility
towards Lee regarding ownership of the house. 
This testimony countered J.B.C.=s theory that Lee killed herself because she felt like she was being
blamed for her late husband=s death.       








As further evidence that Lee=s death was not a suicide, the State offered the testimony of Emerick
Hernandez, who played basketball with J.B.C. on occasion.  Hernandez and his family lived down the
street from Lee.  Hernandez testified
that roughly a week after Lee=s death, J.B.C. told him that police were blaming him for Lee=s death.  J.B.C. confessed to
Hernandez that he had put a gun to Lee=s head and forced her to write a suicide note before he shot and
killed her.  Hernandez said that he could
smell alcohol on J.B.C.=s breath,
and he had no idea why J.B.C. confessed to him that he had killed Lee.  J.B.C. denied making his grandmother write a
suicide note, and he denied killing her. 
He testified that Hernandez either misunderstood what he said or he was
lying about it.  J.B.C. said that he told
Hernandez that he and his brother were being accused, but he denied admitting
to Hernandez that the allegations were true. 

E.  Procedural History

At trial, the State alleged
that J.B.C. engaged in delinquent conduct by committing murder.  After hearing the evidence, the jury returned
a verdict finding that J.B.C. had engaged in the alleged delinquent
conduct.  After a disposition hearing,
the trial court sentenced J.B.C. to forty years= confinement with the Texas Youth Commission, with a possible transfer
to the Institutional Division of the Texas Department of Criminal Justice.  

J.B.C. brings forth three
issues on appeal.

III.  Admission of Photograph

In his first issue, J.B.C.
claims that the trial court erred and abused its discretion by admitting
Petitioner=s Exhibit 55
over objection that the probative value of the photograph was substantially
outweighed by the danger of unfair prejudice. 
In sum, J.B.C. argues that an autopsy photo of Lee=s scalp pulled back, which exposed extensive hemorrhaging under her
skull, was Aunnecessarily
graphic and disturbing . . . and . . . not necessary to establish any element.@  We disagree.








Although relevant, evidence
may be excluded if its probative value is substantially outweighed by the
danger of unfair prejudice, confusion of the issues, or misleading the jury, or
by considerations of undue delay or needless presentation of cumulative
evidence.  Tex. R. Evid. 403.  The
admissibility of photographs over a challenge is within the sound discretion of
the trial court.  Moreno Denoso v.
State, 156 S.W.3d 166, 177 (Tex. App.CCorpus Christi 2005, pet. ref=d); see Rojas v. State, 986 S.W.2d 241, 249 (Tex. Crim. App.
1998); Montgomery v. State, 810 S.W.2d 372, 378B80 (Tex. Crim. App. 1990).  The
trial court=s decision
will be reversed only if it was Aoutside the zone of reasonable disagreement.@  Moreno Denoso, 156
S.W.3d at 177 (quoting Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim.
App. 1992), cert. denied, 507 U.S. 975 (1993)). 








A court may consider the
following factors in determining whether the probative value of photographs is
substantially outweighed by the danger of unfair prejudice: (1) the number of
exhibits offered, (2) their gruesomeness, (3) their detail, (4) their size, (5)
whether they are offered in color or in black and white, (6) whether they are
close-up, and (7) whether the body depicted is clothed or naked.  Sosa v. State, Nos. 14-03-01116-CR,
14-03-01117-CR, 14-03-01118-CR, 2005 WL 171352, at *3 (Tex. App.CHouston [14th Dist.] Jan. 27, 2005, pet. ref=d); see Rojas, 986 S.W.2d at 249.  Autopsy photographs are generally admissible
unless they depict mutilation caused by the autopsy itself.  Frank v. State, 183 S.W.3d 63, 77
(Tex. App.CFort Worth
2005, pet ref=d); see
Rojas, 986 S.W.2d at 249.  However,
photographs that depict the nature, location, and extent of a wound have been
declared probative enough to outweigh any prejudicial effect.  Frank, 183 S.W.3d at 78; see Legate
v. State, 52 S.W.3d 797, 807 (Tex. App.CSan Antonio 2001, pet. ref=d).  Changes rendered
by the autopsy process are of minor significance if the disturbing nature of
the photograph is primarily due to the injuries caused by the appellant.  Santellan v. State, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997) (holding autopsy photographs
depicting swabs in and a red stain around the victim's mouth admissible).

Here, J.B.C. complains of
the admission of an autopsy photo depicting 
Lee=s scalp.  Admitted as Petitioner=s Exhibit 55 during the testimony of medical examiner Dr.
Sisler, the eight-by-ten-inch color photograph was offered and admitted to
refute J.B.C.=s suicide defense
and show that additional wounds were inflicted prior to death.  The photograph depicted extensive
hemorrhaging underneath Lee=s skin on her skull. 
Dr. Sisler testified that the photograph fairly and accurately depicted
the injuries to Lee=s scalp.  He further
testified that the injuries were not otherwise visible before pulling back the
scalp.  








The photograph did not depict mutilation caused by the
autopsy, but the nature, location, and extent of the wounds as testified to by
Dr. Sisler.  See Frank, 183 S.W.3d
at 79.  An application of considerable force would have been
necessary to fracture Lee=s suture line and cause such extensive hemorrhaging.  The photograph depicted the full extent
of Lee=s wounds and was important in
determining the manner of death because
the wounds were separate from the gunshot wound, which was the cause of
death.  The pulling back of the skin did
not render the evidence significantly more gruesome than the facts of the crime
itself because the photograph was the only way to reveal to the jury the full
extent of Lee=s injuries.  See, e.g., Hayes v. State, 85 S.W.3d
809, 816 (Tex. Crim. App. 2002).  Furthermore,
because there was only one photograph of the hemorrhage and it reflected the
manner of Lee=s death and J.B.C.=s state of mind,
it was relevant and more probative than prejudicial.  See Laca v. State, 893 S.W.2d 171, 180
(Tex. App.CEl Paso 1995, pet. ref=d) (holding
photographs showing part of deceased=s body, pool of
blood, and instruments of death were admissible).  In sum, no less-gruesome evidence was available to demonstrate to the
jury the nature, location, and extent of the injures inflicted upon Lee=s skull and visible only underneath her scalp.  








Therefore, we hold that
the probative value of the photograph was not substantially outweighed by its
prejudicial effect.  See Tex. R. Evid. 403.  Accordingly, the trial court did not abuse
its discretion by admitting Petitioner=s Exhibit 55.  See
Frank, 183 S.W.3d at 78.  We overrule
J.B.C=s first issue. 

IV.  Jury Argument

In his second issue,
J.B.C. claims that the State made an improper jury argument during final
argument.  J.B.C. argues that the trial
court erred and abused its discretion by failing to grant a mistrial after
sustaining his objections and ruling the argument improper.  Again, we disagree.








To be permissible, the State=s jury argument
must fall within one of the following four general areas: (1) summation of the
evidence, (2) reasonable deduction from the evidence, (3) answer to argument of
opposing counsel, or (4) plea for law enforcement.  Felder v. State, 848 S.W.2d 85, 94-95
(Tex. Crim. App. 1992), cert. denied, 510 U.S. 829 (1993); Alejandro
v. State, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).  When the trial court sustains an objection
and instructs the jury to disregard but denies a defendant=s motion for a
mistrial, the issue is whether the trial court abused its discretion in denying
the mistrial.  Hawkins v. State,
135 S.W.3d 72, 77 (Tex. Crim. App. 2004). 
Only in extreme circumstances, when the prejudice caused by the improper
argument is incurable, i.e., Aso prejudicial
that expenditure of further time and expense would be wasteful and futile,@ will a mistrial
be required.  Id.; see also Simpson v.
State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), cert. denied, 542
U.S. 905 (2004).  In determining whether
the trial court abused its discretion in denying the mistrial, we balance three
factors: (1) the severity of the misconduct (prejudicial effect), (2) curative
measures, and (3) the certainty of conviction absent the misconduct.  Hawkins, 135 S.W.3d at 77; Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999). 

Here, J.B.C. argues that
the State engaged in improper jury argument by making a personal remark to
J.B.C. and by giving a personal opinion about the evidence.  The comments made by the State included Awe=re so glad that that pot plant was so important to you,@ and Awe have the best darn circumstantial case that I=ve ever seen.@  Both remarks were
improper and were objected to by J.B.C., whose objections were sustained by the
trial court.      








The State presented a
breadth of circumstantial evidence that a reasonable jury could and did find
difficult to reconcile with J.B.C.=s suicide defense theory. 
Evidence elicited and presented through witness testimony during trial
revealed that Lee had suffered a defensive wound to her arm, a bruised and
swollen eye, lacerations to the back of her head, and multiple skull
fractures.  She was found face down with
her arms tucked under her body and a gunshot wound to the back of her head.  Evidence also showed that J.B.C. was a pot
smoker and occasional methamphetamine user who disrespected his grandmother and
her home.  J.B.C. was also the only one
of five boys in the house at the time of the shooting who left the living room
and went down the hallway where Lee=s bedroom was located. 
Furthermore, Hernandez testified that J.B.C. confessed to having forced
Lee to write a suicide note before shooting her in the head.  The evidence in support of the jury=s verdict was
substantial, and nothing indicates that J.B.C.=s adjudication was
based on an improper argument rather than this evidence.  See Simpson,
119 S.W.3d at 272.  Any prejudice to
J.B.C. was cured by the court=s instruction to disregard.  See id.  Furthermore, J.B.C. has failed to demonstrate
that the trial court=s instruction was insufficient to cure the error. 

Therefore, we hold that any
prejudice caused by the State=s jury argument was not so extreme as to be incurable by
the trial court=s instruction to
disregard.  See Hawkins, 135 S.W.3d at 77.  Accordingly, the
trial court did not abuse its discretion by denying J.B.C.=s motion for a mistrial.  See id.  We overrule J.B.C.=s second issue. 

 

 








V.  Sufficiency of the Evidence

In his third issue,
J.B.C. contends that the evidence was factually insufficient to support his
adjudication.  J.B.C. argues that the
evidence supporting the delinquent conduct by committing murder finding was so
weak and evidence to the contrary so overwhelming that the finding should be
set aside and a new trial ordered.

A.  Standard of Review 








When reviewing the
factual sufficiency of the evidence to support a conviction, we view all the
evidence in a neutral light, favoring neither party.  Watson v. State, 204 S.W.3d 404, 414
(Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d 795, 799 (Tex.
Crim. App. 2005).  We then ask whether
the evidence supporting the conviction, although legally sufficient, is nevertheless
so weak that the fact-finder=s determination is clearly wrong and manifestly unjust or
whether conflicting evidence so greatly outweighs the evidence supporting the
conviction that the fact-finder=s determination is manifestly unjust.  Watson, 204 S.W.3d at 414B15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000).  To reverse under the
second ground, we must determine, with some objective basis in the record, that
the great weight and preponderance of all the evidence, though legally
sufficient, contradicts the verdict.  Watson,
204 S.W.3d at 417.

In determining whether
the evidence is factually insufficient to support a conviction that is
nevertheless supported by legally sufficient evidence, it is not enough that
this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id.  We cannot conclude that a conviction is
clearly wrong or manifestly unjust simply because we would have decided
differently than the jury or because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson,
23 S.W.3d at 12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App.
1997).  Unless the record clearly reveals
that a different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory
testimonial evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor,
and those jurors were in attendance when the testimony was delivered.@ Johnson, 23 S.W.3d at 8.  Thus, we must give due deference to the
fact-finder=s determinations,
Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.








An opinion addressing
factual sufficiency must include a discussion of the most important and
relevant evidence that supports the appellant=s complaint on appeal. 
Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  

B. 
Application

As detailed above, the State presented a substantial
amount of evidence against J.B.C. at trial. 
The State presented evidence that Lee did not exhibit suicidal
tendencies, that she had engaged in normal activities prior to being shot, and
that her injuries indicated homicide as the manner of death.  The circumstantial evidence as well as J.B.C.=s confession to
Hernandez supported the state=s theory that
J.B.C. had forced Lee to write a suicide note before shooting her.  Similarly, J.B.C. presented contradictory
evidence that Lee had written a Asuicide note,@ that she had
exhibited odd behavior when opening the door for J.B.C.=s friends, that
there was no gunshot residue on J.B.C.=s hands, and that
no one heard a gunshot.  Specifically,
J.B.C. relied on the lack of physical and forensic evidence linking him to Lee=s murder and
proffered a suicide theory as the manner of death.  The jury agreed with the State.








We may not simply substitute our judgment for the jury=s.  Johnson, 23 S.W.3d at 12; Cain,
958 S.W.2d at 407.  Under these facts,
the record does not clearly reveal that a different result was appropriate, and
therefore we must defer to the jury=s determination of
the weight to be given contradictory testimonial evidence.  Johnson, 23 S.W.3d at 8.  Resolution of the conflict Aoften turns on an
evaluation of credibility and demeanor, and those jurors were in attendance
when the testimony was delivered.@  Id. 


Therefore, we hold that the evidence supporting J.B.C.=s adjudication was
not so weak that the jury=s determination
was clearly wrong and manifestly unjust. 
Furthermore, we hold that the conflicting evidence did not so greatly
outweigh the evidence supporting J.B.C.=s adjudication
that the jury=s determination was manifestly
unjust.  See Watson, 204 S.W.3d at
416B17; Johnson, 23 S.W.3d at
11.  Accordingly, we hold the evidence
factually sufficient to support J.B.C.=s adjudication for
delinquent conduct by committing murder. 
We overrule J.B.C.=s third issue.

VI. 
Conclusion

Having overruled J.B.C.=s three issues, we
affirm the trial court=s judgment.

 

 

 

BOB MCCOY

JUSTICE

 

PANEL F:    HOLMAN,
GARDNER, and MCCOY, JJ.

 

DELIVERED: July 26, 2007











[1]Michael,
J.B.C.=s
older brother, was nineteen at the time of the shooting, and will, therefore,
be referred to as Michael rather than by his initials throughout this
opinion.  During trial, Michael was
referenced by witnesses during testimony as Michael, Joshua, Josh, and ABones.@  





[2]By
most accounts there were only five boys in Lee=s
house that dayCJ.B.C.,
Michael, Franks, Bonsignore, and Frailey. 
Only J.B.C. testified that a sixth person, Eric Ramos, was also
present.  None of the other boys
mentioned Ramos, and Ramos was not called to testify in this case.