**AFFIRM; Opinion Filed January 16, 2020.**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-18-00917-CR**

**FAUSTINO VALDEZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 203rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1600331-P**

# MEMORANDUM OPINION
Before Justices Myers, Osborne, and Nowell
Opinion by Justice Osborne

Appellant, Faustino Valdez, was convicted of murder and sentenced to life imprisonment plus a $10,000 fine. On appeal, appellant raises four issues: (1) the trial court erred by admitting into evidence a personal writing of appellant; (2) the trial court erred by overruling appellant's relevancy objection to certain photographs; (3) the trial court erred by admitting photographs of the complainant's decomposed body; and (4) the evidence was insufficient to prove the means of death was unknown. We affirm.

## Background

Appellant does not challenge the sufficiency of the evidence to support his conviction for murder. Consequently, and because the background facts are known to the parties, we recite only those facts relevant to the disposition of this appeal. TEX. R. APP. P. 47.1.

Marisol Espinosa, appellant's ex-girlfriend and the mother of his two children, disappeared in late December of 2015. Her badly decomposed body was found in the Trinity River bottoms on March 6, 2016. Due to the condition of her remains, an exact cause of death could not be determined.

Appellant and Marisol were known to have a contentious "on again off again" relationship for several years. They had been arguing a lot in the days before her disappearance. Consequently, appellant became a suspect as early as late December 2015. He did not take an active part in many searches conducted by family and friends for Marisol and he showed a reluctance to be interviewed by the police while the investigation of her disappearance was still considered a missing person's case.

In early January 4, 2016, appellant left Dallas. Prior to leaving, he told a cousin that he had killed Marisol and threw her body over a bridge on I-20. He also asked two cousins to help him burn his vehicle.

Appellant was later discovered by the FBI working and living in Mexico under an alias. He was brought back to Dallas County and indicted for Marisol's murder.

### The Letter

Appellant claims that the trial court erred by admitting a letter, which was discovered in his vehicle, into evidence. Specifically, appellant claims that (1) the letter was not directed to any particular person; (2) the letter is a "personal writing" covered by the warrant requirements of TEX. CODE CRIM. PROC. ANN. art. 18.02; (3) the letter is protected by the Fourth and Fifth Amendments to the U.S. Constitution, U.S. CONST. amends IV and V, and any objection whatsoever is sufficient to preserve error; and (4) admission of the letter was harmful because the letter established motive. The State responds that appellant has failed to preserve error for appellate review because the issues he raises on appeal differ from his objections at trial. The State also responds, in the

alternative, that the letter was admissible as the product of a consensual search of that vehicle or, in the further alternative, that admission of the letter was harmless. We agree with the State.

***Objections and Ruling at Trial***

During trial, counsel for appellant objected to admission of the letter. The trial court heard arguments from both sides outside the presence of the jury.

> [DEFENSE COUNSEL]: And the one objection I had, Your Honor . . . We didn't address this, I don't know why I didn't catch this. It's Number 113.
>
> [PROSECUTOR]: That's it.
>
> THE COURT: Okay. Looks like a letter.
>
> [DEFENSE COUNSEL]: It's a letter that was found . . . during an inventory search of my client's car. They want to offer it . . . [N]umber one; it's hearsay. Two, they can't authenticate who wrote it and who it's to. You can kind of insinuate who it's from and to, and I just don't think it's admissible.
>
> THE COURT: Okay. Let me read it.
>
> Well, I mean, I've already started reading it but the thing of it is, it doesn't even say who it's to. So I think that's a problem. But I'll listen to your argument.
>
> [PROSECUTOR]: Here's the thing I think . . . (defense counsel's) . . . argument is, we don't know who wrote it. Well, this is a letter that was found in the defendant's vehicle.
>
> THE COURT: Can you prove that's his handwriting?
>
> [PROSECUTOR]: Yeah. I have other letters that he wrote with the handwriting the same.
>
> THE COURT: I know, but you don't know who he wrote it to or who he's talking to.
>
> [PROSECUTOR]: I know exactly who he's talking to because that's the victim's handwriting up at the top.
>
> [DEFENSE COUNSEL]: Judge, we would need a handwriting expert to verify all of that.
>
> [PROSECUTOR]: The Rules don't require a handwriting expert. The Rules require that somebody's familiar or some way to make a comparison. With respect

to . . . if the issue is what the victim wrote at the top, I'd be happy to redact that. But really what I'm interested in is what the defendant wrote.

THE COURT: If you can prove that the defendant wrote this letter and you redact that at the top, then I'll let it in. But you can't prove to whom he wrote the letter, can you? You can . . . assume, but you're not going to be able to prove to them he wrote the letter.

[PROSECUTOR]: Well, Judge, in terms of whether the Court is going to allow this into evidence . . . that's really the jury's determination whether they believe – obviously, you know who we're going to argue that it's to. Whether you believe or whether we believe –

THE COURT: I don't care whether I believe –

[PROSECUTOR]: Right. It's for the jury to determine.

THE COURT: I'm just wondering if the State knows. I mean, are you going to try to put on evidence to show to whom the letter was written?

[PROSECUTOR]: Of course. I think the context of what all the testimony that's been put on in this case regarding the relationship between the defendant and the victim, the fact that this is found in . . . the search of his vehicle is pretty contemporaneous to her disappearance and the Court and the jury have heard testimony for what's going on with this relationship. You know, we can –

THE COURT: Okay.

[PROSECUTOR]: So it's a question, Judge, of whether there is a threshold amount of, you know, reliability that this is the defendant's handwriting. It's an admission by a party opponent. It also shows his state of mind, which under 38.36 is admissible.

THE COURT: Okay. I'm going to allow it in . . . because I believe after everything is said and done, all the evidence is put about the letter, it goes to the weight and the jury can decide what they want to do with it.

[DEFENSE COUNSEL]: Judge, if you'll give me a chance on a break to get you some case law, this is completely hearsay, they can't authenticate it and the Rules on handwriting experts don't allow us to just assume –

THE COURT: I will do that, I will give you an opportunity to get some case law before it comes in.

[DEFENSE COUNSEL]: They've also, from our client – or to Marisol, they have tried to put in tons of evidence about all the affairs he's had. So who knows if this is to some other girl or some other – we don't know. But they want to do that,

they want to ride that horse that he's involved with other women but then say this letter is to and from Marisol, I don't think that –

[PROSECUTOR]: That is for the jury to determine what the point is under the law. The handwriting issue is that – if we have – the defendant has been in jail for a year. He writes letters and we've turned all these letters we've intercepted over to the defense. We have them. We have his handwriting; it's him. We can have somebody – if necessary, I can have the investigator take the stand saying these are letters and we've compared these letters --

THE COURT: Okay. Well, as of right now, it's in. But I'm asking you to hold off until he has –

[DEFENSE COUNSEL]: Give us a chance – after this first break, I'm going to need to get some case law.

[PROSECUTOR]: So just . . . for timing purposes, this is going to be coming in through the second witness that we have this morning. I don't know how long the first witness is going to take –

THE COURT: Well, I'm going to tell you not to address it until we have taken a break and given them an opportunity, even if it means you have to bring her back.

[PROSECUTOR]: Fair enough. Fair enough.

[DEFENSE COUNSEL]: Thank you.

Following a break in the trial, but prior to admission of the letter, defense counsel renewed his objection, but did not present any new arguments or law. The trial court again overruled the objection, stating, "Okay, the ruling is the same."

The State admitted the letter through the testimony of a Dallas police crime analyst who had conducted a search of appellant's vehicle on January 5, 2016. The analyst testified that the letter was found inside the glove box of appellant's vehicle among other documents. When the State offered the letter, defense counsel renewed his earlier objection, which the trial court again overruled.

The writing was admitted into evidence and the prosecutor read the letter to the jury:

Every day I wake hoping to get a fresh start. Pray I can undo the mistake I've done to you. Every day it's the same thing, my memories come to haunt me

and I regret it all what I put you and the kids through. Basically, I'm saying sorry, sorry for my stupidity, if you find in your heart to forgive me. But if you find it hard to do so, then all right. Who can blame you. There is only me to blame. I'm sorry that I wasn't there for you and the kids. I'm sorry for everything. But please forgive me. The thought of me making you cry, repeats in my head over and over. I'm sorry that I failed you and disappointed you.

The defense cross-examined the analyst about the particulars of the letter:

Q. The letter that was just read in court was found in the red Ford Explorer Sports Trac?

A. Yes.

Q. It's not dated, is it?

A. I believe there is a date on it. No.

Q. It could have been a week before, could have been six months ago?

A. Possibly.

Q. And there aren't any names on it. We can kind of assume who it's to and from. There are no names on it, signatures on it or dates on it.

A. Correct.

Q. And there is two different handwritings, there is some on the body of the letter, there is different handwriting at the top. Is that correct?

A. Yes.

### *Preservation*

In order to preserve an issue for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection. TEX. R. APP. P. 33.1(a). The objections raised at trial and presented to the trial court for a ruling must comport to the issues raised on appeal. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). An appellate court may not reverse the trial court's decision on a legal theory not presented to the trial court by the complaining party. *Hailey v. State*, 87 S.W.3d 118, 122 (Tex. Crim. App. 2002).

At trial, appellant objected on two grounds: (1) that the letter was hearsay and (2) that the State could not authenticate who wrote it.[1] Appellant does not raise those same grounds on appeal. Rather, appellant raises additional complaints that were not presented to the trial court.

Because appellant did not object at trial to the letter on the grounds he now urges on appeal, he has failed preserve error, if any, for our review. *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014) (stating "[w]e are not hyper-technical in examination of whether error was preserved, but the point of error on appeal must comport with the objection made at trial"); *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986) (holding that a point of error on appeal must comport with objection made at trial). Appellant presents nothing for our review.

We overrule appellant's first issue.

### **Admission of Photographs**

In his second and third issues, appellant challenges the admissibility of State's Exhibits 168-183, photographs of Marisol's decomposed body and the wooded area where her body was found. Appellant challenges the relevancy of these photographs and argues that the prejudicial effect of the photographs outweighed any probative value. The State responds that the trial court did not abuse its discretion by admitting these photographs because they show nothing more than the condition of the body and the area in which that body was found and that any prejudicial effect of those photographs is outweighed by its probative value to the prosecution's case. We agree with the State.

### *Standard of Review*

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court abuses its discretion only when its decision to admit or exclude the evidence lies outside the zone of

---

[1] Appellant admits in his brief to this Court that the letter "was written in [a]ppellant's own hand."

reasonable disagreement. *Id.*; *see also De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). We will uphold a trial court's evidentiary ruling if it was correct on any theory of law applicable to the case. *See De La Paz*, 279 S.W.3d at 344.

*Admissibility of Photographs*

Relevant evidence is always admissible unless specifically prohibited. TEX. R. EVID. 402. Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action. TEX. R. EVID. 401. A trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. Rule 403 governs the admissibility of photographic evidence alleged to be unduly prejudicial. *Emery v. State*, 881 S.W.2d 702, 710 (Tex. Crim. App. 1994).

When undertaking a Rule 403 analysis of photographic evidence, a court may consider many factors in determining whether the probative value of the photographs is substantially outweighed by the danger of unfair prejudice including (1) the number of photographs offered, (2) their gruesomeness, (3) their detail, (4) their size, (5) whether they are in color or in black and white, (6) whether they are close-up, (7) whether the body depicted is clothed or naked and whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photograph to the appellant's detriment. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006); *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002). A court, however, should not be limited to this list; the availability of other means of proof and the circumstances unique to each individual case should also be considered. *Hayes*, 85 S.W.3d at 815.

*Objections and Rulings at Trial*

Prior to hearing evidence in this case, the trial court heard objections to the proposed admission of the photographs marked as State's Exhibits 51[2] and 168 through 183:

> [DEFENSE COUNSEL]: Judge, the next issue . . . (the prosecutor) . . . has graciously provided me yesterday, a printed copy of his exhibits, the photographic exhibits, so I can review them. And we have some objections to a few of those.
>
> *
>
> [DEFENSE COUNSEL]: Yes. Basically if you'll notice Exhibit Number 51, in particular. . . . Two objections on that. I don't think it's relevant. And I have a 403 objection that I think it's unduly prejudicial.
>
> *
>
> [DEFENSE COUNSEL]: Let me add something else to that. That also kind of coincides with Exhibits 168 through 183, which are 15 or 16 pictures of the deceased in the decomposed state in the woods. I have the same objection, 403 objection to that, very prejudicial, duplicitas. (sic) I mean, we don't need 15 pictures.
>
> *
>
> THE COURT: I'll be honest with you . . . these photographs are horrible. I mean, I can't even tell what I'm looking at.
>
> [THE PROSECUTOR]: Judge, let me sort of explain what the relevance and significance of it is . . . I can also tie that into the argument of State's Exhibits 168 through 183 . . . the objection is to 15 pictures, and those are crime scene photos from where the victim's body was found.
>
> *
>
> [THE PROSECUTOR]: [I]n addition to those 15 pictures that I'm going to offer for record purposes, we have an additional 45 crime scene photos which contain images of the victim's body that was found. And I have carefully culled through the photographs, we've consulted with the medical examiner, we've consulted with our witnesses who were at the crime scene and determined that the 15 we have culled out of the total of 60 from the crime scene were the most relevant to depict what was found. And the reason that's relevant . . . is actually the probative value – is huge, is that one of the things we've alleged in the indictment is simply homicidal violence. The medical examiner is going to testify she doesn't have any way to identify any specific injuries, and the reason that is, is because of the state

---

[2] Appellant does not complain on appeal about the admission of State's Exhibit 51, a photograph of a tattoo on Marisol's abdomen.

of decomposition of the body. And these pictures are necessary in order to depict that. The body was found ten weeks after the victim disappeared. And due to the state of decomposition, that is part of what we have to prove is, we actually have to prove why we can't determine exactly what happened, more specifically, even we've alleged that an unknown object, unknown and unknowable object was used to inflict the homicidal violence, the deadly weapon. And in order to prove that element, we have to prove that there is no way that we can know exactly what the deadly weapon was, and the 15 pictures we've culled most carefully – selected, I should say, best are able to depict that. So under 403 balance, Your Honor, the danger of unfair prejudice has to substantially outweigh the probative value. The probative value is extremely high considering what we are required to prove under the indictment. So based on that, based on the fact the State has carefully culled through, we have no intentions of inflaming the jury.

Obviously, we need to prove the elements of our indictment. We also need to, in doing that – showing the state of decomposition of the body is critical.

THE COURT: Anything else . . . before I make my ruling?

[DEFENSE COUNSEL]: . . . 168 through 183, I understand their need to have a few of those, but they don't need 15 pictures showing the body in various states of decomposition. Many of those are the same picture just closer, closer, closer, closer. So I would ask that the Court limit them to two or three of those pictures out of the 168 to 183. . .

THE COURT: I'm going to deny your request but I am going to order the State that when you publish these, I don't want you just to leave them up there lingering on these screens.

[THE PROSECUTOR]: Quite frankly, Judge, my intention, out of respect for the family, many of whom are going to be here, I don't intend to publish those on the screen.

THE COURT: Well, even the jurors also. We are accustom to seeing these photographs, but they are not.

[THE PROSECUTOR]: I don't want to display those scenes all up and down the screens.

THE COURT: Okay. That's fair enough.

*Admission of the Photographs*

The photographs were admitted through the testimony of Dallas Police Detective Steven Carey. On March 6, 2016, Carey responded to a discovery of human remains in a wooded area close to the Dowdy Ferry bridge in Dallas. Carey described the area as muddy and wet; it was

apparent that some water had just receded. The body, which was subsequently identified through DNA analysis as Marisol's, was "a mixture of decomposition, skeletal remains and mummification." Her legs appeared to Carey to have been partially wrapped around a tree or a bush. There were bags over certain portions of the body, one of which was intertwined with her skull. In Carey's opinion, these were unusual remains to find.

Carey identified State's Exhibits 168-183 as some of the photographs that he had taken that day. He had taken "quite a few more" but had culled through them with the prosecutor to get the most relevant photographs. Some photographs that were "pretty demonstrative" were left out of the group of exhibits offered into evidence.

When the prosecutor offered the photographs into evidence, defense counsel renewed his objection and the trial court reiterated its ruling:

> [DEFENSE COUNSEL] Judge, I'm going to renew my objection from yesterday to 168 through 183 based on just the graphic nature of the picture, the duplicitas (sic) nature of the pictures because it's 20 pictures of the same thing just from different angles, different distances. Under 403 – I was going to renew my 403 objection at this time.

> THE COURT: Okay. Noted. And my ruling will remain that they are admitted.

### *The Photographs Were Admissible*

Generally, photographs are admissible where verbal testimony about the same matters is admissible. *Emery*, 881 S.W.2d at 710. Here, the photographs were used by the detective to describe the place where Marisol's body was found and the condition of her body at the time of its discovery. Both were subjects about which Carey testified without objection. The photographs were merely visual evidence of Carey's oral descriptions. The fact that photographs accompanied oral testimony establishing the same facts does not render the photographs cumulative or of insignificant probative value. *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999).

And a trial court does not err merely because it admits into evidence photographs which are gruesome. *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995).

We cannot determine from the record whether the photos shown to the jury were color or black-and-white; the copies of the photographs in the record before this Court are black and white. The photographs show the scene where the body was found from various angles; some are from a distance while others are closer views. The body is mostly skeleton and is clothed; some photographs show the trash bag over parts of the body. While the photographs were gruesome, they were not unnecessarily so. *Shuffield*, 189 S.W.3d at 787 (holding that the trial court did not abuse its discretion by admitting crime scene photographs which were relevant to show the location of the body at the crime scene and were "no more gruesome than the crime scene itself as it was found by the police"); *Sonnier,* 913 S.W.2d at 519 (holding that while the photographs were gruesome and disagreeable to look at, they depicted nothing more than the reality of the brutal crime committed). And any alterations to Marisol's body were the result of the effects of exposure and nature; there is no evidence that her body was altered by any means, such as an autopsy, before the photographs were taken.

The photographs had probative value. The purpose of these photographs was to show what the detective and the medical examiner would describe in their testimony. The photographs showed what the detective saw: Marisol's decomposed body at the place where it was found several months after her disappearance. The photographs also show why, due to the decomposition of the body, the medical examiner was unable to determine exactly what caused Marisol's death and why the State relied on allegations of inflicting homicidal violence with an unknown object in the indictment.

The probative value of the photographs is not outweighed by undue prejudice. The prosecutor and the detective examined the crime scene photographs beforehand and limited the

ones to be shown to the jury. Although the photographs showed decomposition the body suffered due to the manner in which it was disposed, the photos showed nothing more than the reality of the crime committed. *See Chamberlain*, 998 S.W.3d at 237 (stating that gruesome photographs depicting disagreeable realities of the crime committed are "powerful visual evidence, probative of various aspects of the State's case" and hence admissible); *Madden v. State*, 799 S.W.2d 683, 696-97 (Tex. Crim. App. 1990) (holding that photographs were admissible despite showing decomposition and change to the body caused by submersion in water for five days); *Shavers v. State*, 881 S.W.2d 67, 77 (Tex. App.—Dallas 1994, no pet.) (stating that while "the scene depicted in the photograph is gory and gruesome" that does not make the photograph "more prejudicial than probative when the crime scene is gory and gruesome.").

We conclude the trial court did not abuse its discretion in admitting the photographs. We overrule appellant's second and third issues.

## Manner and Means of Death

In his fourth issue, appellant claims that the evidence was insufficient to prove that the grand jury exercised due diligence in their efforts to ascertain the means of Marisol's death. The State responds that appellant relies on law that has been overruled. Further, the State argues that the evidence is sufficient to prove that appellant committed this murder by inflicting homicidal violence with an unknown object. We agree with the State.

### *The Indictment and Jury Charge*

The indictment in this case alleged:

That FAUSTINO VALDEZ, hereinafter called Defendant, on or about the 29th day of December, 2015, in the County of Dallas, State of Texas, did unlawfully then and there intentionally and knowingly cause the death of MARISOL ESPINOSA, an individual, hereinafter called deceased, by INFLICTING HOMICIDAL VIOLENCE TO DECEASED WITH AN UNKNOWN OBJECT, a deadly weapon, THE EXACT NATURE AND DESCRIPTION OF WHICH IS UNKNOWN AND UNKNOWABLE TO THE GRAND JURY,

–13–

And further did unlawfully then and there intend to cause serious bodily injury to MARISOL ESPINOSA, hereinafter called deceased, and did then and there commit an act clearly dangerous to human life, to-wit: by INFLICTING HOMICIDAL VIOLENCE TO DECEASED WITH AN UNKNOWN OBJECT, a deadly weapon, THE EXACT NATURE AND DESCRIPTION OF WHICH IS UNKNOWN AND UNKNOWABLE TO THE GRAND JURY, and did thereby cause the death of MARISOL ESPINOSA, an individual.

Appellant did not move to quash the indictment prior to trial.

The trial court's jury charge tracked the language of the indictment by allowing conviction if the jurors found one of two alternative theories of the crime:[3]

> Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt, that on or about December 29, 2015, in Dallas County, Texas, the defendant intentionally or knowingly caused the death of Marisol Espinosa, an individual, by inflicting homicidal violence to Marisol Espinosa with an unknown object, a deadly weapon, you will find the defendant guilty of the offense of murder and so say by your verdict.
>
> OR
>
> If you believe from the evidence beyond a reasonable doubt, that on or about December 29, 2015 in Dallas County, Texas, the defendant intended to cause serious bodily injury to Marisol Espinosa and committed an act clearly dangerous to human life by inflicting homicidal violence to Marisol Espinosa with an unknown object, a deadly weapon, and did thereby cause the death of Marisol Espinosa, you will find the defendant guilty of the offense of murder and so say by your verdict.

Further, the charge defined a deadly weapon as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *See* TEX. PENAL CODE ANN. §1.07(17)(B).

Appellant did not object to this charge or request any special charge.

### Proof of Due Diligence for "Unknown" Allegations is No Longer Required

Under both the indictment and the jury charge, in order to convict appellant of murder, the State was required to prove beyond a reasonable doubt that appellant inflicted homicidal violence

---

[3] The jury could have convicted appellant under either theory. *Guevara v. State*, 152 S.W.3d 45, 52 (Tex. Crim. App. 2004); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

with an unknown object. Appellant does not challenge the sufficiency of the evidence to prove his guilt for Marisol's murder, but merely the sufficiency of the evidence to prove that the grand jury used "due diligence" to ascertain that he killed her with an "unknown object."

Appellant relies on *Matson v. State*, 819 S.W.2d 839, 847 (Tex. Crim. App. 1991) and *Hicks v. State*, 860 S.W.2d 419, 424-25 (Tex. Crim. App. 1993) for the proposition that "when the State alleges in the indictment that the means of the commission of the offense is unknown to the grand jury, there must be proof to support that allegation at trial." *Matson* held that when an indictment alleges that the manner or means utilized to inflict an injury is unknown and the evidence at trial does not show what type of object was used, a prima facie showing exists that the object was unknown to the grand jury. *Matson,* 819 S.W.2d at 847. *Matson* further held that if the evidence at trial shows what type of object was used to inflict the injury, an issue is raised with respect to whether the grand jury had information as to the object used, and "in that case, the State must prove that the grand jury did not know the manner and means of inflicting the injury and that it used due diligence in attempts to ascertain the manner or means." *Id*. *Hicks* relied on *Matson*'s due diligence rule, though it found that, under the facts of that case, a showing of due diligence was not essential. *Hicks*, 860 S.W.2d at 425-26.

The Court of Criminal Appeals has expressly disavowed the "due diligence" rule of *Matson*. *See Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001). Further, that Court has overruled *Hicks*. *Sanchez v. State*, 376 S.W.3d 767, 772 (Tex. Crim. App. 2012).

Under current law, the State is entitled to indict a defendant and to charge the jury that the manner and means of how the offense was committed is unknown. *See Stobaugh v. State*, 421 S.W.3d 787, 864 (Tex. App.—Fort Worth 2014, no pet.); *Moulton v. State*, 395 S.W.3d 804, 811–12 (Tex. Crim. App. 2013) (Cochran, J., concurring). Sufficiency of the evidence as to whether the State has proved those allegations is reviewed by comparing the evidence to a hypothetically

–15–

correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge is a charge which "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

### Testimony of Medical Examiner

Dr. Candace Schoppe, a Dallas County medical examiner, performed an autopsy on Marisol's body. She concluded that the manner of Marisol's death was a homicide "based on the investigative evidence and autopsy findings:"

> [DR. SCHOPPE]: Because of the advanced state of decomposition, we had to rely fairly heavily on scene and investigative information. One, the first thing that's suspicious is that a body is dumped out in a secluded area, that is suspicious to us in general. When that body also has a plastic bag that is taped multiple times around the neck, that's even more suspicious. It's – we know that it's a person who has been missing for a period of time that has no history of drug abuse, this is out of character for that person, these are all very suspicious circumstances.

Dr. Schoppe later learned that Marisol's glasses had been found in her vehicle with her blood on them. She considered that to be significant supporting evidence "for us calling it homicide (sic) violence."

Dr. Schoppe further described the difficulty in trying to determine a cause of death:

> [DR. SCHOPPE]: A case like this, when we would do the autopsy, our most likely mechanism of injury or death would be strangulation or suffocation. And when we do the autopsy, we would be looking for very specific things. In this particular case, because of the level of decomposition, which in some areas the victim was almost completely skeletonized, things that we would look for to show evidence of strangulation or suffocation were not present. So we would look at the eyes, but her eyes were no longer there. We would look at the skin on the neck and the face, the voice box. There is a little bone above the box voice called the hyoid bone, we would want to look at that and see if either of those were injured. We would be looking for any evidence if there was any bleeding in the neck, any fingernail marks on the face and neck, any pattern or depression from a ligature; so, from the tape being tied around the neck. But we don't have enough of the neck that was intact for us to examine those things.

–16–

So in the absence of being able to identify those positive findings, we had to focus more on what we didn't have. And what we didn't have was any other reason for her to be dead. . . . she had no broken bones. We didn't identify any on X-ray or by physical examination. Her head, inside her head, she did have a little bit of brain tissue left. If there had been bleeding within the brain that was big enough to have actually resulted in her death, we should have still seen some residual blood or discoloration inside the skull, which was not present. The organs . . . her heart, her lungs, liver, kidneys, they all looked normal. There was no evidence that she had heart disease or anything else that would have caused her to die suddenly or unexpectedly. We examined her lungs, there was no evidence that blood had been aspirated into her lungs. So if she had a . . . cut to her neck, that that cut the vessels in her neck, which would be how you have to die if you have a cut to your neck, you would see blood within the airway and we should have seen dark discoloration and some residual blood in the throat and/or in the deeper airways which were still intact, not the throat part but closer to the lungs.

So in the absence of all of those physical findings that would account for death and negative toxicology testing, our opinion is that this was a death due to – and we phrased it as homicidal violence since we can't prove with one hundred percent certainty that it was strangulation or suffocation but that would be our most likely mechanism of death.

Dr. Schoppe testified that while strangulation or suffocation were the most probable causes of death, she was unable to prove either. As she testified: "The advanced state of decomposition made it unable for us to examine the parts of the body that would be important in definitively saying that there was evidence or not evidence of strangulation or suffocation." She could not provide a specific cause of death.

Dr. Schoppe further testified that the State's allegations in the indictment that "the object, that deadly weapon, is unknown and unknowable" went along with the conclusion of homicidal violence:

[DR. SCHOPPE]: So the deadly weapon could be hands around somebody's neck, it could be a ligature around somebody's neck, it could be the plastic bag secured over the face and around the neck but there is absolutely no way for us to know since we can't determine which or what thing was exactly what killed her.

In short, it was the medical examiner's opinion that there was no methodology by which to determine what object was used to kill Marisol.

–17–

*Analysis*

This case does not present even a limited set of possibilities regarding manner and means. *Compare Sanchez*, 376 S.W.3d at 774 (holding that where there was a list of multiple alternatives alleged in the indictment that could explain the victim's cause of death the trial court should submit a charge on only those alternatives supported by the evidence). Here, no witness, including the medical examiner, could be certain of the specific cause of Marisol's death. The medical examiner hypothesized that Marisol probably died as a result of strangulation or suffocation but that was not a certainty. Appellant does not point to any other evidence in the record to show an alternative explanation for how Marisol was killed. Because the precise manner of death could not be determined by the medical examiner, and because there was no other evidence as to the precise cause of Marisol's death, the object which caused her death truly is unknown and it was not error for the jury to be so charged.

We conclude the jury was properly charged that it could convict only if it found that appellant caused Marisol's death by inflicting homicidal violence with an unknown object. Further, because there was no evidence as to the precise cause of Marisol's death, this Court must "be satisfied that the manner and means may well be unknown to the jury as well." *Moulton*, 395 S.W.3d at 814 (Cochran, J., concurring). Because there was no way of knowing under the facts developed at trial what manner or means caused Marisol's death, the evidence is sufficient to support a finding by the jury that whatever object caused her death was unknown. *Id.* What matters is that the jury was convinced, beyond a reasonable doubt, that appellant was the person who intentionally caused Marisol's death "however he did it." *Id.*

We overrule appellant's fourth issue.

## Conclusion

The trial court's judgment is affirmed.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
180917F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

FAUSTINO VALDEZ, Appellant

No. 05-18-00917-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 203rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1600331-P.
Opinion delivered by Justice Osborne.
Justices Myers and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 16th day of January, 2020.