Larry Allen HAYES, Appellant,

v.

The STATE of Texas.

No. 73830.

Court of Criminal Appeals of Texas, En Banc.

Sept. 11, 2002.

John Dunn MacDonald, Conroe, for Appellant.

Marc Brumberger, Assistant District Attorney, Conroe, Matthew Paul, State's Attorney, Austin, for State.

WOMACK, J., delivered the opinion for a unanimous Court.

The appellant was convicted in May 2000 of capital murder. Tex. Penal Code sec. 19.03(a). Pursuant to the jury's answers to the special issues set forth in Code of Criminal Procedure article 37.071 sections 2(b) and 2(e), the trial judge sentenced the appellant to death. Article 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, sec. 2(h). The appellant raises four points of error including challenges to the sufficiency of the evidence at the punishment phase. We shall affirm.

### STATEMENT OF FACTS

In 1999, the appellant and his wife, Mary Hayes were living together at 2667 South Woodloch in Conroe, Texas. On July 13, 1999 the appellant told his stepson that his wife was having an affair and that "[he did not] think that he could forgive her like she forgave me." Cathy Varner also testified that during the week of July 16, 1999 the appellant suspected an affair between Mary Hayes and Gary Hurt, Mrs. Hayes's co-worker.[2] Mr. Hurt testified that the appellant called him about the affair and said: "Don't you know that people get killed over these things?"

On July 16, 1999 between 10:45 and 11:00 p.m., Paula Odendalski, the appellant's neighbor, heard a shrill, high-pitched noise and saw Lauren Hayes, the appellant's ten-year-old daughter, running across the street. Ms. Odendalski met Lauren in her driveway and asked her what was happening. Lauren was screaming and said that her father was trying to kill her mother. Ms. Odendalski called 911 at 10:51 p.m. Lauren told the 911 operator that she heard her mother and the appellant fighting. The appellant was hitting Mrs. Hayes on the head and chased her into Lauren's bedroom. Lauren ran into the bedroom and saw that the appellant had shot her mother in the hand. Mrs. Hayes tried to crawl under Lauren's bed to escape. Hazel Hayes, the appellant's mother, also ran to the room and tried to stop the appellant. At that point, Lauren ran out of the house and heard several more shots. During the 911 phone conversation Lauren also told the operator that she thought that the appellant left the house in a black Chevy Suburban truck.

The police arrived and found Hazel Hayes wailing inside of the house. She told the police that the appellant and Mrs. Hayes were fighting over Mrs. Hayes's alleged affair and that she tried to stop the appellant, but it didn't work. She said that he reloaded his gun and asked her for a kiss before he drove away. The police found the body of Mary Hayes in Lauren Hayes's bedroom. There was blood on the wall and the bed and brain matter and skull fragments on the floor. Dr. Parungao, the assistant medical examiner of Harris County, testified that she was shot

---

1. Unless otherwise indicated all future references to Articles refer to the Code of Criminal Procedure.

2. Cathy Varner was the live-in girlfriend of Gary Hurt at the time of the trial. She and Mr. Hurt insisted that no affair took place.

Ms. Varner requested that Mr. Hurt take a polygraph examination to prove that no relationship between him and Mrs. Hayes existed. Ms. Varner and Mr. Hurt testified at trial that he took the test on July 15, 1999 and passed with 99.9% accuracy.

seven times, three times in the head, once in the left shoulder blade, twice in the back, and once in the hand.[3] Two of the wounds were close contact wounds, fired within six inches of the body. The victim's head was described as "shattered" and "crushed." The police also recovered eight "spent" .44 magnum cartridge casings at the scene.

Shortly after killing his wife, the appellant drove to the Diamond Shamrock gas station at FM 3083 and Creighton Road in Montgomery County. A witness testified that she saw the appellant lead the clerk, Rosalyn Robinson, out of the store at gunpoint to Ms. Robinson's white Ford Mustang. As the witness started to drive away she heard a gunshot.

When the police arrived on the scene they found Ms. Robinson lying on the ground in front of the appellant's black Suburban, alive, but unresponsive. Later Ms. Robinson died. Dr. Parungao testified that the cause of death was multiple gunshot wounds to the head and abdomen. Ms. Robinson was shot three times, once in the abdomen, once in the right arm, and once in the face. Ms. Robinson's white Mustang was missing.

A man named Vale Yates testified that later that same evening he stopped at a Super 8 Motel in Cleveland, Texas. He was having some trouble with the starter in his Chevy Blazer, so he left the truck running while he went inside to check in. When he returned, his Blazer was gone and parked behind where it had been was Rosalyn Robinson's white Mustang. Inside the Mustang was an overnight bag containing prescription medications bearing the appellant's name, a cartridge carrier, and three spent shell casings.

The Polk County Sheriff's Department received a dispatch at 12:20 a.m. to report to a Dandy Double truck stop in Polk County, Texas to apprehend a potential suspect from Montgomery County. Sharon Glass and her husband reported that a man driving a Chevy Blazer asked them for a jump in the parking lot. When he turned to the side, Mrs. Glass saw a large gun tucked into the waistband of his pants. When the deputy sheriff apprehended the appellant, he was walking south across the Dandy Double parking lot with his shirt off and tucked into his waistband. The officers yelled at him to put his hands up, and the appellant turned and pulled away the white t-shirt to reveal a .44 magnum. The appellant then started to raise the gun, and Sergeant Waller fired a shot which missed the appellant. The appellant moved into a "shooter stance" and Sergeant Waller fired a second shot into the appellant's back. The appellant was taken into custody and transported to Columbia Conroe Medical Center for medical attention. At the punishment phase of trial, nurses testified that the appellant was verbally and physically abusive and threatened to kill one nurse "if he could get his hands on her."

## SUFFICIENCY OF THE EVIDENCE ON PUNISHMENT

 In his **first** point of error, the appellant claims that the evidence presented at trial was legally insufficient to support the jury's finding that he was a continuing threat to society. *See* Art. 37.071, sec. 2(b)(1). In reviewing the sufficiency of the evidence on punishment, this Court looks at the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have believed beyond reasonable doubt

---

**3.** Initially, Dr. Parungao testified that Mary Hayes was shot only six times. However in his testimony he describes seven separate injuries.

that the appellant would probably commit future criminal acts of violence that would constitute a continuing threat to society. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Ladd v. State*, 3 S.W.3d 547, 558 (Tex.Cr.App.1999). The circumstances of the offense alone may be sufficient to support an affirmative answer to the first special issue. *Kunkle v. State*, 771 S.W.2d 435, 449 (Tex.Cr.App.1986). If the circumstances of the case are sufficiently cold-blooded or calculated, then the facts alone may support a finding of future dangerousness. *Id.* Other evidence, such as prior criminal record, prior bad acts and uncharged conduct, psychiatric evidence, and character evidence, also may support the finding. Also relevant are possible mitigating factors such as the state of mind of the appellant at the time of the offense. *Id.* The appellant contends that his "inability to cope" with his wife's alleged affair provoked him to kill her. The jury was not required to accept his contention, and the State presented evidence that the appellant knew of the alleged affair the week preceding the murder. This does not support a finding that this was a crime of passion since the appellant had a significant "cooling off" period from the initial shock.

In addition, other evidence supports a finding that the murder was cold-blooded and calculated. The appellant's weapon was not automatic and had only a six-round capacity. Since the appellant shot at his wife eight times, he had to stop and manually unload and then reload more ammunition before shooting at her at least twice more. Furthermore, the appellant's defense of passion does not explain the unprovoked murder of Rosalyn Robinson. According the store's surveillance tape which was admitted at trial, the appellant took Ms. Robinson's keys and led her by gunpoint to her car where he shot her

three times. Before the appellant shot Ms. Robinson he transferred his overnight bag to her car. These facts reflect the planning and calculation that was involved in these crimes.

The State also presented evidence that the appellant lacked remorse about the murders after he was arrested. Two weeks after his arrest, the appellant asked an attendant why he was placed on suicide watch at the Montgomery Jail infirmary. The attendant replied that "it should be obvious [because] he murdered two people and we were concerned about his state of mind." The inmate looked directly into the attendant's face and replied that "he had nothing to be suicidal about and that he had no suicidal thoughts whatsoever."

The appellant's long criminal history of escalating violent offenses permit a rational jury to conclude that the appellant would continue to be a threat to society. Accordingly, we hold that the evidence is legally sufficient to support the jury's affirmative answer to the future dangerousness issue. **Point of error one is overruled.**

## BRADY CLAIM

■ In point of error **two,** the appellant claims that his right to a fair trial under the due process clause of the Fourteenth Amendment was violated when the State failed to disclose favorable punishment evidence. Specifically, he objects that the prosecution did not disclose a letter written by the appellant to his mother-in-law, Rosa Faust, in which he says that he is "sorry for what he has done."

■ The standard under *Brady v. Maryland* is that the prosecutorial suppression of exculpatory evidence violates due process when the evidence is material either to guilt or to punishment. 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* involved the suppression of

a companion's confession to the crime, exculpating the defendant. *Id.* at 84, 83 S.Ct. 1194. The Supreme Court also stated that the "[*Brady*] rule ... applie[d] in three quite different situations. Each involved discovery after trial of information which had been known to the prosecution *but unknown to the defense.*" *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (emphasis added). In *Havard v. State,* this Court held that the *Brady* rule did not apply when the appellant was already aware of the information. 800 S.W.2d 195, 204 (Tex.Cr.App. 1989) (overruling an alleged *Brady* error involving an appellant's prior statement to police). "[A]ppellant knew of the fact that he made a statement to the police and the content of that statement ... [He] knew of both the existence and the content of the statement, as a matter of simple logic, because he was there when he made it." *Id.* *See also Jackson v. State,* 552 S.W.2d 798, 804 (Tex.Cr.App.1976) ("We cannot conclude that the prosecutor violated his duty to disclose favorable evidence to the appellant when the evidence was already available to him"). The appellant's situation is similar to that in *Havard* and *Jackson.* He was aware of the existence of, as well as the contents of, the letter to Rosa Faust because he wrote it. Therefore, this case is not within the *Brady* rule. **Point of error two is overruled.**

## ADMISSION OF PHOTOGRAPHS

In points of error **three** and **four,** the appellant claims that the trial court erred in admitting autopsy photographs on the grounds that they were inflammatory and that their prejudicial value far outweighed their probative value.[4] Tex.R. Evid. 403. Specifically, the appellant objects to

State's exhibits 11C, D, and E and 19A on the grounds that they depict the work of the medical examiner and not the actions of the appellant himself.

The admissibility of a photograph is within the sound discretion of the trial court. Rule 403 of the Texas Rules of Evidence states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by consideration of undue delay, or needless presentation of cumulative evidence.

 Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Montgomery v. State,* 810 S.W.2d 372, 376 (Tex. Cr.App.1990) (op. on original submission). The trial court's decision will not be disturbed on appeal unless it falls outside the zone of reasonable disagreement. *Jones v. State,* 944 S.W.2d 642, 651 (Tex.Cr.App. 1996).

 A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or in black and white, whether they are close-up and whether the body depicted is clothed or naked. *Wyatt v. State,* 23 S.W.3d 18, 29 (Tex.Cr.App.2000). A court, however, should not be limited to this list. The availability of other means of proof and the circumstances unique to each individual case should also be noted. *Id.*

---

4. The appellant does not contest the relevance of the photographs. *See Santellan v. State,* 939 S.W.2d 155, 171 (Tex.Cr.App.1997) (overruling the appellant's relevance objection on appeal because the point was not preserved with a 403 objection at trial).

**816**

In addition, autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Rojas v. State,* 986 S.W.2d 241, 249 (Tex.Cr.App.1998). Changes rendered by the autopsy process are of minor significance if the disturbing nature of the photograph is primarily due to the injuries caused by the appellant. *Santellan v. State,* 939 S.W.2d 155, 173 (Tex.Cr.App.1997) (holding autopsy photographs depicting swabs in and a red stain around the victim's mouth admissible).

Exhibits 11 C, D, and E depict Mary Hayes's head and torso from three different angles. During trial Dr. Parungao testified that when he received the body it was so deformed and shattered that he had to shave the head, stitch it back together, and put paper inside of the head to expand it in order to see the entry and exit wounds. When asked whether he was required to stitch the portions of the head, he replied that "I had to so I [could] see the alignment of the skin—the entrance wound or the laceration, because it [was] just a messed up head." Exhibit 19A depicts Rosalyn Robinson with a gunshot wound to her face and a portion of the skin pulled back. The State claims that there are no facts in the record supporting the appellant's claim that the wound was altered by Dr. Parungao during the autopsy. In its brief, however, the State directly cites to the portion of the record where the prosecutor admits at a bench conference that the wound was altered:

> PROSECUTOR: That is the wound that he's going to testify there was a grazing wound that fractured her skull at the point.
> COURT: And he opened it up to look at it closer, or that is what it looked like?
> PROSECUTOR: No. He opened it up to look at it closer.

Statements made at the bench, though not heard by the jury, are still part of the record if recorded. Tex.R.App. P. 13.2(b)(3). The State's claim that this finding is unsupported by the record is incorrect.

The entry and exit wounds were relevant to the way in which the victim was killed. Without reconstruction, the jury would have seen pictures of a collapsed, bloody head. Dr. Parungao's alteration made the head less gruesome, rather than more gruesome as the appellant contends. The trial court did not abuse its discretion. **Point of error three is overruled.**

Exhibit 19A depicts Rosalyn Robinson's skin pulled back around a grazing gunshot wound to the head, showing the path of the bullet as it passed through her face, fracturing her facial bone and bruising the brain. If the skin were not pulled back, the jury would not be able to see the full extent of one of her fatal injuries. The action of pulling back the skin did not make the evidence significantly more gruesome. In addition, even if the picture were unduly prejudicial under Rule 403, any error that does not affect a substantial right of the appellant is harmless. Tex.R.App. P. 44.2. Tex.R. Evid. 103(a). We will not overturn a case on a nonconstitutional error if, after examining the record as a whole, we have a fair assurance that it did not influence the jury, or influenced them only slightly. *Schutz v. State,* 63 S.W.3d 442, 444 (Tex.Cr.App. 2001). Considering the weight of other evidence, including additional autopsy photographs and the Diamond Shamrock surveillance tape showing the appellant shooting Ms. Robinson, admission of 19A did not unduly influence the jury in its decision. **Point of error four is overruled.**

We affirm the judgment of the trial court.