

NUMBER 13-06-614-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**THOMAS LUCAS SHORT, JR.
A/K/A THOMAS SHORT,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                          **Appellee.**

**On appeal from the 319th District Court of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Justice Yañez**

Appellant, Thomas Lucas Short, Jr. a/k/a Thomas Short, was indicted for intentionally and knowingly causing the death of an unborn child by hitting and striking its mother with his hands and feet. After a jury trial, appellant was convicted for the capital

murder of the unborn child,[1] and his punishment was assessed by the jury at life imprisonment. On appeal, appellant argues that the trial court abused its discretion by (1) admitting prejudicial photographs, (2) denying his request for a mistrial after the State's witnesses made reference to extraneous offenses, and (3) denying his request for a mistrial after the State commented on his right to remain silent. We affirm.

## I. ADMISSION OF PHOTOGRAPHS

In his first issue, appellant argues that the trial court erred in allowing the State to submit exhibits 32, 33, and 34 over his rule 403 objections.[2] The exhibits are color photographs that were admitted during the testimony of Ray Fernandez, M.D., a medical examiner for Nueces County, who performed an autopsy and examination of the unborn child. According to Dr. Fernandez, the photographs showed a ruler; the unborn child, who "was about 19, 20 weeks gestation"; the umbilical cord; and the placenta.

### A. Applicable Law

The admissibility of photographs over a challenge is within the sound discretion of the trial court.[3] The trial court's decision will be reversed only if it was "outside the zone of reasonable disagreement."[4] We weigh the following factors in reviewing a trial court's evidentiary ruling under rule 403: (1) the probative value of the evidence; (2) the potential

---

[1] *See* TEX. PENAL CODE ANN. § 19.03(a) (Vernon Supp. 2008); *see generally id.* at § 1.07(26) (stating that an "individual" includes "an unborn child at every stage of gestation from fertilization until birth"), (49) (stating that "death" includes, "for an individual who is an unborn child, the failure to be born alive") (Vernon Supp. 2008).

[2] *See* TEX. R. EVID. 403.

[3] *Rojas v. State*, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998); *Montgomery v. State*, 810 S.W.2d 372, 378-80 (Tex. Crim. App. 1991) (op. on reh'g).

[4] *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992); *Montgomery*, 810 S.W.2d at 380.

to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence.[5] In the context of the admission of photographs, we also consider the following factors: (1) the number of photographs, (2) their size, (3) whether they are in color or black and white, (4) whether they are gruesome, (5) whether the body depicted is clothed or naked, and (6) whether the body has been altered by autopsy.[6]

In Texas, photographs are generally admissible when verbal testimony regarding the photographed subject is admissible.[7] Moreover, autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself.[8] Changes rendered by the autopsy process are of minor significance if the disturbing nature of the photograph is primarily due to the injuries caused by the crime.[9] As long as autopsy photographs aid the jury in understanding the injury and do not emphasize mutilation caused by the autopsy, they are admissible.[10] A photograph is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, unless it

---

[5] *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004); *Montgomery*, 810 S.W.2d at 389-90.

[6] *Erazo*, 144 S.W.3d at 489.

[7] *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999); *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996) (photograph admissible where forensic pathologist's verbal testimony about the same was admissible); *Emery v. State*, 881 S.W.2d 702, 710 (Tex. Crim. App. 1994); *Phipps v. State*, 904 S.W.2d 955, 958 (Tex. App.–Beaumont 1995, no pet.).

[8] *Rojas*, 986 S.W.2d at 249.

[9] *Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002).

[10] *Todd v. State*, 911 S.W.2d 807, 809 (Tex. App.–El Paso 1995, no pet.).

is offered solely for the purpose of inflaming the minds of the jury.[11]  When the power of the visible evidence emanates from nothing more than what the defendant has done, the trial court has not abused its discretion merely because it admits the gruesome photographs.[12]

## B. Use and Purpose of the Photographs

Appellant argued at trial that the State had not proven beyond a reasonable doubt that the unborn child died from injuries he inflicted on the unborn child's mother—an allegation that was made by the mother ("Virginia") to various trial witnesses prior to trial, but was later retracted and refuted by Virginia at trial.  Appellant raised this argument when he moved for directed verdict and when he made his closing arguments to the jury.  During his closing arguments, appellant argued that the unborn child's death could have resulted from a number of causes.  One of the alternative causes asserted by appellant stemmed from Virginia's testimony, wherein Virginia stated that appellant did not stomp on her stomach; rather, she claimed her stomach injury resulted from accidentally tripping and falling hard onto the ground.

Dr. Fernandez utilized exhibits 32, 33, and 34 while expressing his belief as to what caused the unborn child's death.  He utilized exhibit 32—a photograph that primarily focused on the unborn child's body—while testifying that the body had no physical deformities.  He utilized exhibit 33—a photograph that better showed the umbilical cord and the "fetal surface" of the placenta—while testifying that he found the umbilical cord to be

---

[11] *Potter v. State*, 74 S.W.3d 105, 112 (Tex. Crim. App. 2002); *Ward v. State*, 787 S.W.2d 116, 120 (Tex. App.–Corpus Christi 1990, pet. ref'd).

[12] *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995).

4

free of any irregular conditions, and found no infection or hemorrhaging on the placenta's fetal surface. Dr. Fernandez utilized exhibit 34—a photograph that showed the side of the placenta that would "come in contact with the mother's uterus"—while testifying about irregularities he found on that side of the placenta.

With the aid of exhibit 34, Dr. Fernandez showed the jury where on the placenta he found irregularities. He noted abnormal areas on the placenta that were "flattened and compressed"—indicating "an area where there had been separation, what [is called] abruption of the placenta from the uterus, and bleeding between the placenta and the uterus." Dr. Fernandez testified that the nature of the abruption observed on the placenta commonly occurs when "there's been trauma causing that separation," usually involving "victims in automobile crashes"; "with people that fall from a significant height"; and "when there's been force to the abdomen, like being struck in the abdomen, kicked, punched in the belly." Dr. Fernandez testified that he has not seen such an abruption being caused by "a simple fall," but that the abruption would be consistent with the type of injury a pregnant mother would sustain after being struck twice on the belly.

### C. Discussion

The photographs are probative because they aided the jury in understanding (1) how and why Dr. Fernandez excluded possible causes of death, and (2) how and why he concluded that the cause of death stemmed from "trauma" inflicted upon Virginia's abdomen. The State needed the photographs because appellant contested the State's theory as to cause of death. The record reveals that not much time was needed to develop the evidence—Dr. Fernandez's discussion of the photographs encompasses about twenty pages of trial testimony. Moreover, the photographs' potential to impress the jury in some

5

irrational, yet indelible, way was small.  There were three colored photographs of the unborn child, the umbilical cord, and the placenta.  The photographs were five-by-seven inches in size.  The unborn child was naked, but the body had not been noticeably altered by an autopsy, nor was the body gruesome.  If the photographs did arouse the passions of the jury, they would remain admissible because the State did not offer the photographs for the sole purpose of inflaming the minds of the jury.[13]  The admissibility of the photographs is bolstered by the fact that the verbal testimony regarding the photographed subject was admissible,[14] and by the fact that the photographs did not depict mutilation of the unborn child by the autopsy itself.[15]  For all of these reasons, we find that the trial court's admission of exhibits 32, 33, and 34 was not outside the zone of reasonable disagreement.[16]  Accordingly, we overrule appellant's first issue.

## II. REFERENCING EXTRANEOUS OFFENSES

In his second issue, appellant argues that the trial court erred in not granting a mistrial after two witnesses for the State made a reference to an extraneous offense.

### A. Extraneous Offense References

Appellant asserts that the first reference was made by Pauline, Virginia's sister.  As Pauline was testifying about a physical altercation she witnessed between appellant and Virginia—the same physical altercation that, according to the State, resulted in the unborn child's death—she had the following exchange while being questioned by the prosecutor:

---

[13] *See Potter*, 74 S.W.3d at 112; *Ward*, 787 S.W.2d at 120.

[14] *See Chamberlain*, 998 S.W.2d at 237.

[15] *See Rojas*, 986 S.W.2d at 249.

[16] *See Narvaiz*, 840 S.W.2d at 429.

6

Q: Why did you think you needed to help Virginia?

A: Because this ain't the first time Thomas Short ever hit my sister.

Appellant's counsel then asked to approach the bench. At a bench conference, the prosecutor stated that he had instructed Pauline "not to talk about other things [appellant has] done in the past." Appellant's counsel asked the trial court to instruct the jury to disregard the statement; he also requested a mistrial. The trial court denied the request for a mistrial, but did instruct the jury to disregard Pauline's answer.

The second reference came from the testimony of Mary Ann Gamble, M.D. Dr. Gamble evaluated Virginia after the aforementioned altercation allegedly transpired. While being questioned by the prosecutor, Dr. Gamble stated the following:

Q: At some point in time did she give you a statement so that you could treat her medically?

A: I asked her what happened. She said she had got in a fight with her boyfriend. She didn't say his name. About—something about shoes, and he was in a fight with her, and she went outside, he hit her in the face, and then he dragged her by her hair in an alley behind her house, at which point she was on the ground and then he stomped on her belly twice. And I asked if he kicked her, and she said, "No. I was laying on the ground on my back and he lifted his foot up and stomped down on it twice."

. . . .

Q: So she tells you this information, and you said you've got a camera. Based on your training and experience, does that sound like a domestic violence situation to you?

A: Uh-huh. And she told me it wasn't the first time, so—

Appellant's counsel then objected, and the objection was sustained. At a bench conference, the prosecutor maintained that the witness had been instructed to not reference previous incidents between Virginia and appellant. Appellant's counsel asked

7

for a mistrial and an instruction to disregard.  The court denied the mistrial, but did instruct the jury to disregard Dr. Gamble's answer.

## B. Applicable Law

"An extraneous offense is any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging papers."[17]  Evidence of an extraneous offense "is inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be brought against him."[18]  A witness's inadvertent reference to an extraneous offense will seldom necessitate a mistrial.[19]  Rather, a prompt instruction to disregard will generally cure any prejudice associated with the improper testimony.[20]  A mistrial is warranted, however, in "extreme circumstances, where the prejudice is incurable."[21]  Prejudice is incurable only when "the reference was clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds."[22]  In such circumstances, a mistrial is required despite an instruction to disregard.[23]

## C. Discussion

---

[17] *Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003); *see generally* TEX. R. EVID. 404(b).

[18] *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972).

[19] *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

[20] *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000); *Herrero v. State*, 124 S.W.3d 827, 836 (Tex. App.–Houston [14th Dist.] 2003, no pet.).

[21] *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

[22] *Rojas*, 986 S.W.2d at 250.

[23] *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999).

There is no indication that Pauline's and Dr. Gamble's references to past violence between Virginia and appellant were clearly calculated to inflame the minds of the jury, nor is there any indication that the State sought to elicit these references through its questioning. Moreover, we do not believe the complained-of references are of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds. This is because (1) Pauline's and Dr. Gamble's comments were not a concrete reference to an extraneous offense; (2) these witnesses were prevented from elaborating on the mentioned extraneous conduct; and (3) the trial court's prompt sustaining of counsel's objection conveyed the appropriate message that the witnesses' comments were not to be considered.[24] Therefore, the trial court's instruction to disregard cured any error, and the court did not abuse its discretion in overruling appellant's motions for mistrial. We overrule appellant's second issue.

### III. COMMENTS ON APPELLANT'S RIGHT TO REMAIN SILENT

In his final issue, appellant argues that the trial court erred by denying his request for a mistrial after the State's witness, Officer Keith Shadle, inappropriately commented on his post-arrest silence. While under questioning by the prosecution, Officer Shadle stated the following:

Q: Did [appellant] ever tell you that she fell down, that Virginia fell down?

A: No, he didn't.

Q: No?

A: No, I never heard that on the scene.

---

[24] *See Rojas*, 986 S.W.2d at 250.

Q: Well, on the way to the station?

A: No.

Appellant's counsel then approached the bench and told the court that the prosecutor's question was a direct comment on appellant's right to remain silent. Counsel then asked for a mistrial and an instruction to disregard. The court denied the request for a mistrial, but instructed the jury to disregard Officer Shadle's last statement.

The Fifth Amendment's privilege against self-incrimination is violated by a comment on a defendant's post-arrest silence.[25] Such a comment is tantamount to a comment on a suspect's failure to testify at trial because it raises an inference of guilt from the invocation of a constitutional right.[26] The prohibition against commenting on post-arrest silence "includes testimony regarding a defendant's contrition or remorse because such testimony can only come from the defendant."[27] An improper comment on a suspect's post-arrest silence does not lead to automatic reversal.[28] Generally, an instruction to disregard an improper comment on a defendant's post-arrest silence is sufficient to cure any harm.[29]

We find that the trial court's prompt instruction to disregard sufficiently cured any harm that may have resulted from Officer Shadle's allegedly improper comment. Consequently, we conclude the trial court did not abuse its discretion in denying appellant's

---

[25] *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995) (en banc).

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Ho v. State*, 171 S.W.3d 295, 306 (Tex. App.–Houston [14th Dist.] 2005, pet. ref'd) (op. on reh'g).

motion for mistrial.  We overrule appellant's final issue.

## IV. Conclusion

We affirm the trial court's judgment.

LINDA REYNA YAÑEZ,
Justice

Do not publish.  Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and filed
this the 11th day of December, 2008.