In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00378-CR**
**NO. 09-18-00379-CR**
_____

**MELISA ANN MILLER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 411th District Court**
**Polk County, Texas**
**Trial Cause Nos. 25454 & 25455**

**MEMORANDUM OPINION**

A grand jury indicted Appellant Melisa Ann Miller ("Miller" or "Appellant") for the murder of James Bradberry, a first-degree felony, and for intoxication assault with a vehicle causing serious bodily injury to Melissa Bradberry, a third-degree felony. *See* Tex. Penal Code Ann. §§ 19.02, 49.07. Miller pleaded "not guilty," but a jury found Miller guilty on both charges. The jury also made a deadly weapon

1

finding for both crimes charged. The court assessed punishment at fifty-five years on the murder charge, and ten years on the intoxication assault charge, with the sentences to run concurrently. Miller appeals her convictions, and in two issues, she challenges the admission of autopsy photos and the legal sufficiency of the evidence supporting the jury's verdict. We affirm.

## Indictments

A grand jury indicted Miller in cause number 25454 for felony murder, and the indictment alleged that the underlying felony offense was driving while intoxicated. The indictment alleged that Miller

> . . . while in the course of and in the furtherance of the commission of the felony of driving while intoxicated and having two prior convictions for driving while intoxicated did commit an act clearly dangerous to human life, to-wit: by operating her motor vehicle in such a manner as the motor vehicle moved into an on-coming lane of traffic and did collide with a motorcycle operated by James Bradberry and did cause the death of James Bradberry[.]

A grand jury also indicted Miller in cause number 25455 for intoxication assault with a vehicle causing serious bodily injury, alleging that Miller:

> . . . operate[d] a motor vehicle in a public place while intoxicated, and did by reason of such intoxication cause serious bodily injury to another, Melissa Bradberry, through accident or mistake, namely: by allowing her motor vehicle to move into an on-coming lane of traffic and did collide with a motorcycle on which Melissa Bradberry was a passenger[.]"

2

Both indictments alleged that Miller used a deadly weapon, an automobile, in the commission of the offense.

Evidence

Testimony of Trooper Kevin Burman

Trooper Kevin Burman, with the Texas Department of Public Safety ("DPS") highway patrol, testified that he was dispatched to a crash involving motorcycles and severe injuries on FM 356 in Polk County on June 25, 2016, shortly after 9 p.m. According to Burman it was dry, hot and clear that day. Burman observed an SUV partly in the road and partly on the shoulder, close to the guardrail. He identified four victims at the scene: Melisa Miller, the occupant of the SUV; Ronald Creech, the operator of the first motorcycle; James Bradberry ("James"), the driver of the second motorcycle; and Melissa Bradberry ("Melissa"), James's passenger. When Burman arrived on the scene, James was being treated, and a tourniquet had been placed on his leg because it had been severed just below the knee. According to Burman, Melissa was unconscious, had difficulty breathing, and was gravely injured. She was transported from the scene by helicopter.

Trooper Burman testified that he spoke with other individuals who were riding in a group of four motorcycles together, with two motorcycles in front and two riding behind. Burman testified that the motorcyclists reported they had been driving about

3

fifty or fifty-five miles per hour. Burman testified that he asked a local reporter at the scene to take photographs, and Burman also took some photographs as well.

State's Exhibits 8 through 37 were admitted, which Trooper Burman recognized as photographs of the scene that night and the next day. Burman estimated that the point of impact was about ten inches into the lane in which the motorcycles were travelling. Burman testified that Exhibit 8 depicted the area of impact, and it showed blood spatter, body tissue, and gouge marks where vehicles collided and gouged out some of the asphalt. Burman testified that Exhibit 9 showed marks in the northbound lane made by the SUV, and that the SUV was traveling southbound. Burman testified that the damage to the SUV was to the front left wheel, grille, and front bumper and there was "less damage to the side of the vehicle[,]" and that State's Exhibit 25 depicted damage to the driver's side headlight assembly and front fender. According to Burman, the damage to the SUV's windshield was "likely Mr. Bradberry's left arm [that] was almost completely severed off." Burman also testified that the driver's side airbag of the SUV was deployed, which suggested frontal impact and not side impact. Burman believed that dents to the SUV hood were from the left handlebar of the motorcycle. The Trooper testified that Melissa ended up about fifty feet away from James.

4

Trooper Burman testified that during his investigation on the night of the crash, he received Miller's purse and that he and Trooper Lenderman searched its contents before taking it to the sheriff's office. Burman identified State's Exhibit 66 as an envelope that he packaged that contained evidence acquired from Miller's purse and Exhibit 67 was the contents. Burman identified State's Exhibits 38, 39, and 40 as photos of a pill bottle in Miller's purse—a prescription bottle of hydrocodone-acetaminophen. Burman also identified Exhibit 41 as a photo of four Soma or carisoprodol pills taken from Miller's purse that were not in a prescription bottle although the pills were prescription medication. Burman also testified that Trooper Lenderman obtained a "consensual blood sample" from Miller at the hospital. According to Burman, analysis of the blood sample by the Houston crime lab detected no alcohol, and the DPS crime lab in Austin did a narcotics analysis on the blood sample.

Burman testified that he spoke with Miller at the hospital where "she still seemed to be impaired[]" and lacked the "normal use of normal mental and physical faculties . . . from the introduction of narcotics or alcohol in the person's system." He observed Miller's movements were slow and deliberate, her eyes appeared glassy and bloodshot, her speech was slurred, her coordination was "off[,]" and she seemed emotionless despite the traumatic situation. Burman agreed that in his driver

examination report, he wrote that Miller "[a]ppeared to be under the influence of medication." Trooper Burman agreed that he arrested Miller the night of the accident for intoxication manslaughter, intoxication assault, and possession of Soma without a prescription. State's Exhibits 73 and 74 were admitted into evidence and published to the jury, and Burman testified that he recognized these as videos taken from the patrol vehicle's cameras that night as he was at the scene and interacting with Miller.

Testimony of Kaylie Allbright

Allbright testified that, while driving one night in June 2016, she observed a vehicle pull onto the highway swerving to the right and left, and the vehicle contacted at least one motorcycle:

> She was swerving. The vehicle was swerving on the road and hit -- well went over the yellow and the white lines -- the yellow line being in the middle and the white line being on the outside -- and hit a couple of motorcycles.
> . . .
> The vehicle was going onto the other side of the yellow line and almost into the ditch, back and forth . . . [and] [s]werving across the white line to my right almost into the ditch as well.
> . . .
> I could see her swerving, or the vehicle swerving, and it [] went over the yellow line to my left and hit some motorcycles.
> . . .
> The vehicle that hit the motorcycles kept going . . . . It didn't stop right when the motorcycle was hit. It went farther on down before it was stopped.

6

Allbright recalled that at one point, both tires on the driver's side of the vehicle "were completely over the yellow line[.]"

Testimony of Ronald Creech

Ronald Creech testified that he rode motorcycles with James and Melissa, who were "like family[,]" and that he was riding his motorcycle with them on the day of the accident. According to Ronald, the motorcycles were traveling at the speed limit, about fifty or fifty-five miles per hour, on a two-lane road. Ronald testified that

> . . . We were riding in formation down the road, and I was in front, as I normally was on the center line side. They were directly behind me. I saw someone veering toward the centerline, and I thought someone was just crowding me off the centerline because a lot of times cars will do that. I eased over a little bit. The vehicle kept coming over across the centerline and basically hit me head on, on my left handlebar.

Ronald testified that he saw James lying on the side of the road "like a pile of laundry[]" and his leg was across the road. Ronald testified that Melissa, who had been riding on the back of James's motorcycle directly behind Ronald, had been thrown far enough into the tall grass that it took them fifteen or twenty minutes to find her. Ronald testified that after James and Melissa were taken to the hospital, he went to see them but when he arrived, he was told James had died.

Testimony of Andrew Crane

On June 25, 2016, Andrew Crane testified that he was riding his motorcycle northward with James, Melissa, Ronald, Robert Heifner, and Robert's wife, when a crash occurred. According to Andrew, an SUV came across the lane and Andrew heard a crash. Andrew testified that James was lying on the side of the road, and the SUV was "down the road[]" and had one of the front tires "just about ripped off of it." Andrew did not see the vehicle hit a motorcycle, but he heard the crash. When Andrew turned around, he saw James lying in the road looking "like a pile of clothes" and his left leg was missing. According to Andrew, Melissa was initially "nowhere to be seen[]" but she was later found in a ditch, "bones sticking out of her arm[,]" her "pinkie was about torn off[,]" her right leg from the knee down was "just destroyed pretty much[,]" and she was initially unresponsive. Andrew identified Miller as the driver of the SUV that night.

Testimony of Deborah Heifner

Deborah Heifner testified that she and her former husband Robert Heifner were riding motorcycles with Creech, Nancy Smith, and James and Melissa on the night of June 25, 2016. At one point she felt the motorcycle swerve and she heard a loud noise. When she and Robert pulled over and got off the motorcycle, she saw James lying in the road, she began to render first aid, including placing a tourniquet

on James's left leg and a belt on his left arm and tried to keep him from moving in case there was a spinal injury. Deborah described what she saw: "[James's] left leg was pretty much gone. At about the knee, it was pretty much gone. The left arm was completely busted open around the elbow. He was bleeding profusely." Deborah identified Miller as a person she saw at the site of the crash, and she recognized Miller from a restaurant where she had seen Miller working.

Testimony of Robert Heifner

Robert Heifner testified that he rode motorcycles with James and Melissa, and he had known them for about four months before June 25, 2016. According to Robert, while riding that night, he saw an oncoming car veer over toward them, and he and James both swerved. According to Robert, he saw the impact to James, and James hit the bumper on the driver's side of the car. Robert further testified that he went to the driver of the car, who was standing outside her vehicle, to make sure she was okay. Robert identified Miller as the driver of the car that night, and he described her as "[i]ntoxicated." According to Robert, when he asked her how she was doing, she replied "[t]hey ran me off the road and kept going." Robert recalled that Miller's vehicle was severely damaged.

Testimony of Doug Crocker

Doug Crocker testified that he was driving "a car length or two" behind the motorcycles and he saw the crash as it happened. Crocker testified that he observed a van come about halfway into his lane and hit the handlebars of one of the motorcycles and then it "plowed the other one head on." According to Crocker, he saw a man lying on the ground with one of his legs gone. Crocker agreed that when the vehicle hit the motorcycles, it was in his lane of traffic when he was following the motorcycles. Crocker recalled that he got out of his car and approached the man lying on the road whose leg was missing. According to Crocker, he and another person on the scene found the man's wife in a ditch about fifty yards away, and one of her legs was gone and both her elbows were broken.

Crocker identified Miller as the driver of the vehicle that caused the crash, and he testified that he spoke with her that night to see if she was okay, she told him that her wrist hurt, she kept repeating she was reaching for her phone, and her words were slow.

Testimony of Peggy Samuels

Peggy Samuels testified that she and her husband were riding their ATV near FM 356 and they heard an "awful noise[]" that they knew it was an accident. According to Samuels, they went to the scene, and her husband, who is a police

officer, went to help. Samuels remained on the ATV, and she observed a very distraught woman, on a cell phone, who seemed to be speaking with her mother and repeating "mother" several times. Samuels asked the woman if she was okay, and the woman told her she had just been in an accident. According to Samuels, the woman said, "I was driving, and they just swerved in my lane, came in my lane." Samuels testified that the woman placed her purse on the ATV even though Samuels asked her not to, and then the woman headed back toward the accident. Samuels used her cell phone as a flashlight to look in the woman's purse, where she found two hot dogs and several bottles of prescriptions. Samuels testified that she called her husband over, who took the woman's purse back to the accident scene. Samuels identified Miller as the woman who left a purse on the ATV that night.

Testimony of Detective Dakota Hernandez

Detective Dakota Hernandez testified that she was currently with the San Jacinto County Sheriff's Office, but she was previously with the Onalaska Police Department. According to Hernandez, she was dispatched to the scene of a crash in Polk County. When she arrived at the scene, there was a man lying on the ground whom Hernandez described as having broken bones, bleeding heavily, missing a leg, and having "a broken body." Hernandez learned that a woman (Melissa Bradberry) had also been injured in the accident, but she was "a bit further away" from where

the man who was injured in the accident. Hernandez recalled that the woman who was injured appeared "lifeless[]" and there was "gurgling in her voice." Hernandez identified Miller as the driver of the vehicle at the scene.

Testimony of Lieutenant Mark Jones

Lieutenant Mark Jones with the Polk County Sheriff's Office testified that he is a certified fingerprint examiner, which gives him the ability to take known fingerprints and compare them to a known source. Jones testified that he was asked to take known prints of Miller, and he identified State's Exhibit 70 as fingerprints he personally obtained from Miller. According to Jones, he compared the known prints to those on judgments obtained from the clerk's office, and State's Exhibits 47 and 48 appeared to be photocopies of the original judgments he examined. Based on his comparison, Jones testified that the known prints he took of Miller were the same as the prints on the two judgments.

Testimony of Trooper William Lenderman

Trooper William Lenderman with DPS testified that he was trained in standardized field sobriety testing. He agreed that he was dispatched to the scene of a "[v]ehicle versus motorcycle crash[]" that occurred just after 9 p.m. in Polk County on June 25, 2016. According to Lenderman, upon arriving at the scene, Trooper Burman asked him to check out the driver of the vehicle for possible intoxication,

and he identified Miller as the driver of the vehicle. Lenderman testified that at the scene, Miller "seemed kind of lost[]" but she did not have any visible injuries, and he asked her if she had taken any drugs or drunk any alcohol. According to Lenderman, Miller at first denied taking any medication, but later told him she had taken two pills that were either a painkiller or muscle relaxer. Lenderman conducted standard field sobriety testing, but only one portion was completed because Miller reported to him that she had some physical limitations. Lenderman explained that standardized field sobriety testing has three parts, including horizontal gaze nystagmus ("HGN"), walk and turn, and one-leg stand test, but that he only administered the HGN because Miller had back problems and did not believe she could walk a straight line. Lenderman recalled that he observed "six out of six clues[]" on Miller's HGN test. Lenderman also agreed that the test is not one hundred percent accurate, but he felt he had received one hundred percent accurate results in this instance.

Lenderman identified State's Exhibits 73 and 74 as recordings taken of his conversations and interactions with Miller the night of the accident, which were admitted and published to the jury. According to Lenderman, he had to start the test over several times because when he instructed Miller to follow the movement visually of his pen, Miller would quit following the stimulus. Lenderman testified

13

that Miller told him she had taken two pills that day, and Exhibit 73 shows Miller tell Lenderman that she took two Norco pills earlier in the day and later tell him she took three pain pills that day. Exhibit 73 also shows Miller tell Lenderman that the pills in her purse were Somas that she had had "forever."

According to Lenderman, he requested a blood sample from Miller, and she agreed. Lenderman agreed that he arrested Miller and read the standard warnings to her explaining her rights. Lenderman also testified that "a few pills" were found inside Miller's purse, including 350-milligram carisoprodol, known as Soma, and that Miller had mentioned to him she had a prescription for pain medication. Lenderman identified State's Exhibits 66 and 67 as the carisoprodol pills that were in Miller's possession. According to Lenderman, Miller had called the pills "Soma" when talking about them, and he did not find a prescription for them. Lenderman identified State's Exhibit 75 as the blood draw kit used on Miller at the hospital the night of the accident, and he agreed he was present for the blood draw.

Trooper Lenderman testified that State's Exhibit 47 was a judgment for Melisa Ann Miller dated 2009 for the offense of driving while intoxicated and that State's Exhibit 48 was a judgment for Melisa Ann Miller dated 2011 for the offense of driving while intoxicated, second offense, and that the documents reflected that Miller had pleaded guilty to both offenses. Lenderman agreed that a vehicle that

14

veers across the center lane into oncoming traffic and strikes another vehicle is a deadly weapon and that Miller's vehicle was a deadly weapon in this case. Based on his observations and the standardized field sobriety testing, Lenderman believed that Miller had "lost the normal use of her mental and physical faculties due to the introduction of medication into her body[,]" which contributed to the accident. Lenderman agreed that Miller had told him she had worked ten hours earlier in the day, she was tired, she thought the motorcycles came into her lane, and she had been reaching for the phone she had dropped in her car.

Testimony of Dana Baxter

Dana Baxter testified that she is a forensic scientist with DPS and works in the toxicology section of the Austin crime lab. She also testified that she is trained on the effects of drugs on a person's body. Baxter recalled testing a blood specimen from Miller in 2016. Baxter recognized State's Exhibit 75 as a sample received in June 2016 that was marked with her initials. Baxter also recognized State's Exhibit 51 as the report of her findings she prepared after testing the sample. According to Baxter, the sample she tested detected carisoprodol at 4.6 milligrams per liter, hydrocodone at .06 milligrams per liter, and meprobamate at 20 milligrams per liter. She further testified that her testing detected amphetamine and methamphetamine.

Baxter testified that carisoprodol, sold under the brand name of Soma, is a muscle relaxer. Baxter further testified that when the body breaks down carisoprodol, the breakdown produces meprobamate, an active metabolite that affects the body. According to Baxter, carisoprodol is a central nervous system ("CNS") depressant, like alcohol, and side effects include sleepiness, mental confusion, slowed reaction times, and balancing or vision problems. Baxter testified that meprobamate is also a CNS depressant that results in sleepiness, anxiety, mental confusion, and balance problems. Baxter further testified that hydrocodone is also a CNS depressant and a painkiller, similar in its effects as carisoprodol or meprobamate, and can cause drowsiness, mental confusion, and slowed reaction times. Baxter described amphetamine and methamphetamine as CNS stimulants that can lead to fast speech or agitation, but that on the "down[]side," these drugs can act like CNS depressants and create problems with alertness. According to Baxter, carisoprodol, meprobamate, and hydrocodone taken together have additive effects.

Baxter testified that the levels of carisoprodol she detected were within but "at the upper end of the therapeutic range[]" for this drug, the levels of meprobamate were in the middle of the therapeutic range, and the concentration of carisoprodol and meprobamate were at a level where there could be impaired driving. Based on her test findings, Baxter testified that she would not feel comfortable riding in a car

16

with someone who had this combination and amount of drugs in their system because the levels detected are hazardous for driving and increase the likelihood of poor judgment. Baxter agreed that there is no "per se limit" for intoxication for carisoprodol, meprobamate, and hydrocodone as there is for alcohol intoxication and the standard for intoxication for drugs other than alcohol is "loss of your mental and physical faculties."

Testimony of Megan Barton

Megan Barton testified that she is a technical leader for the toxicology section of DPS in Austin and she works with Dana Baxter. According to Barton, the testing of Miller's blood sample for amphetamines and methamphetamines was performed by Samuel Salinas, who left the DPS lab to work for a lab in another state, but Barton had reviewed Salinas's work on this sample, and she agreed with his procedures and results. Barton testified that the results of testing Miller's blood sample were amphetamine at less than .05 milligrams per liter and methamphetamine at .10 milligrams per liter. According to Barton, amphetamines and methamphetamines are "considered the same[,]"amphetamine is a metabolite of methamphetamine, and the drugs make a person feel more excited, more energetic, or "better about themselves[.]" Barton testified that a level of methamphetamine above .2 is considered abuse when prescribed for ADD, ADHD, or narcolepsy.

17

Testimony of Molly Horn

Molly Horn, a paramedic, testified that she responded to an accident on FM 356 in June 2016. Horn recalled that she was in the second ambulance to arrive at the scene and when she arrived, the first ambulance was taking care of a male patient, and a female patient was lying in the ditch on the side of the road. According to Horn, the woman had pretty severe injuries and her leg was almost completely amputated, she had been placed on a backboard, and a tourniquet was placed on her leg. Horn further testified that the woman was not breathing effectively and had injuries to her arms and hands, and Horn believed the woman might die within minutes. Horn testified that the woman was sedated, a breathing tube was inserted, and a flight crew took the woman onto a helicopter. According to Horn, the woman was identified as Melissa Bradberry. Horn identified State's Exhibit 5 as the EMS report she wrote after the accident. In Horn's opinion, the injuries to Melissa constituted serious bodily injury.

Testimony of Dr. Tommy Brown

Dr. Brown testified that he is a forensic pathologist, a person who performs autopsies to determine cause and manner of death, and he was asked to do an autopsy of James Bradberry in June 2016. Dr. Brown testified that, in his external examination, he noted that James had "severe trauma to the chest and the abdomen

18

and pelvis and the lower left extremity." He also noted three abrasions along the right lower chest, a crushed left pelvis, the part of the left femur had been shoved into the lower abdominal cavity, a crushed and fractured ball joint where the femur joins the hip, an abrasion on his left hip and left inguinal area, a severe large laceration extending from his left hip to just above the knee, a compound fracture of the femur, destruction of the soft tissue in the leg, fractured tibia, a below-the-knee amputation of the left leg and foot, abrasions to his right knee and left shoulder, and a large fracture to the distal femur and proximal forearm. In his internal examination he noted a fractured sternum and blood in the chest cavity.

Dr. Brown recognized State's Exhibit 64 as the autopsy report and copy of the toxicology results that he prepared on James Bradberry, and the autopsy report was published to the jury. Brown agreed that State's Exhibits 52, 54, 55, 58, 60, 62, and 63 accurately depicted the condition of James's body at the time of the autopsy. Dr. Brown testified that Exhibit 54 showed severe injuries to James's left hip and leg, including the below-the-knee amputation; Exhibit 55 showed a large laceration from the left hip to left knee, soft tissue damage, and a compound fracture of the femur; Exhibit 58 showed extensive injury below the knee of the left lower leg, including amputation; Exhibit 60 showed fractures to the left elbow, a large laceration on the left arm, and soft tissue damage; Exhibit 62 showed rib fractures; and Exhibit 63

19

showed separation between the T9 and T10 vertebrae and a spinal fracture. Dr. Brown agreed that his review of the records reflected that an "improvised" tourniquet was applied to James at the scene of the accident, and another tourniquet was placed and secured by the Life Flight crew.

In Dr. Brown's opinion, the cause of James's death was "[b]lunt force trauma of the thorax, or the chest, and pelvis and the left lower extremity with traumatic amputation of the left lower leg." Dr. Brown determined that the manner of death was a motor vehicle-motorcycle accident. On cross-examination, Dr. Brown agreed that for these injuries to have been sustained, the driver that hit James's motorcycle did not have to be intoxicated, and the doctor could not say whether intoxication played a role in the injuries. Dr. Brown testified that James appeared to have been "a very healthy individual[]" and he found no medical issues or concerns that would have shortened James's life.

Testimony of Melissa Bradberry

Melissa testified that she and James had been married seventeen years, and they had two teenaged children. Melissa testified that she and James were in a motorcycle accident on June 25, 2016. Melissa did not remember the accident itself, but she remembered being in a hospital room hooked up to a monitor and with her arms bandaged.

20

According to Melissa, when she first left the hospital, she went to a rehabilitation facility for just under a month to get her to a point where she did not require nursing care and to provide physical therapy. Once she was home, she had to use a wheelchair and her mother moved in to help. Melissa testified she had two more hospital visits for infections and reconstruction of her residual limb. Melissa explained that she went home in August 2016 and she was fitted for a prosthetic leg in about October 2016. She continued to have pain, including phantom pain. Melissa testified that she lost her left pinkie finger and required occupational therapy for her hand. Melissa recalled that she had two surgeries.

Melissa testified that she is a claims specialist for the Social Security Administration, and she returned to work in November 2016, but she had problems with memory and word usage, and it became harder for her to keep up with her work. At the time of trial, Melissa was on extended leave and had filed for disability, and she continued to have visits with doctors. Melissa could not attend James's funeral because she was in the hospital.

The defense did not call any witnesses.

## Admission of Evidence

Appellant's first issue argues that the trial court erred by admitting autopsy photos because the photos had "little probative value[]" because "it was uncontested

21

that James Bradberry died as a result of injuries sustained during a vehicle collision[]" and "there is no question regarding the extent of the injuries Melissa Bradberry suffered as a result of the accident." Therefore, autopsy photos were unnecessary for the jury to determine the cause of death, and the prejudicial value of such photos outweighed their probative value. Appellant argues that the trial court failed to conduct a required balancing test and erred in admitting State's Exhibits 52, 54, 55, 58, 60, 62, 63, 64, and 65.[1] According to Appellant, the autopsy photos "served no purpose other than inflaming the minds of the jurors as to the guilt or innocence of the Appellant."

According to the State, the photos were highly probative because "they demonstrated the nature and extent of the injuries James Bradberry sustained, provided evidence of the cause and manner of his death, and were necessary to the State in developing its case."

Applicable Law

We review a trial court's ruling on the admission or exclusion of evidence under an abuse of discretion standard. *Torres v. State*, 71 S.W.3d 758, 760 (Tex.

---

[1] Although Appellant objects to the admission of Exhibits 64 and 65 as autopsy photos, these exhibits in the appellate record are not autopsy photos. Exhibit 64 is the autopsy report for James, and Exhibit 65 is a candid snapshot of James and Melissa before the accident.

Crim. App. 2002). We will not reverse a trial court's ruling absent a clear abuse of discretion. *Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000). There is no abuse of discretion as long as the court's ruling is within the zone of reasonable disagreement. *De La Paz v. State*, 279 SW.3d 336, 343-44 (Tex. Crim. App. 2009). Moreover, error in the admission or exclusion of evidence will not support reversal unless the error affected a substantial right of the complaining party. Tex. R. Evid. 103(a); Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). If the record as a whole provides fair assurance that the error in evidentiary rulings did not influence the jury, or influenced the jury only slightly, reversal is neither required nor appropriate. *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001).

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). "Once a Rule 403 objection as to prejudice versus probative value is invoked, the trial judge has no discretion as to whether or not to engage in the balancing test required by that rule." *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). "However, a trial judge is not required to sua sponte place any findings he makes or conclusions he draws when engaging in

23

this test into the record[.]" *Id.* "Rather, a judge is presumed to engage in the required balancing test once Rule 403 is invoked[.]" *Id.*

A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. *Hayes v. State*, 85 S.W.3d 809, 815-16 (Tex. Crim. App. 2002). These factors include the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or in black and white, whether they are close-up and whether the body depicted is clothed. *See id.* (citing *Wyatt*, 23 S.W.3d at 29). A court, however, should not be limited to this list. *Id.* The availability of other means of proof and the circumstances unique to each individual case may also be noted. *Id.*

"A trial court does not err merely because it admits into evidence photographs which are gruesome." *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995). If there is error in the admission of evidence, we must determine whether the error was harmless under Rule 44.2(b). *See Prible v. State*, 175 S.W.3d 724, 736-37 (Tex. Crim. App. 2005) (concluding that although admission of autopsy photos was error under Rule 403, the State's use of these autopsy photographs did not affect appellant's substantial rights); *Hayes*, 85 S.W.3d at 816 (citing Tex. R. App. P. 44.2; Tex. R. Evid. 103(a)).

Analysis

The State offered twelve autopsy photographs, Exhibits 52 through 63. The defense objected to the photographs as "graphic in nature and so dramatic and emotion-inducing" that the prejudicial effect of the photos would outweigh any probative value. According to the defense, the testimony of the medical examiner alone would be sufficient to explain the cause of death.

The trial court considered each exhibit individually outside the presence of the jury, including hearing from Dr. Brown what each exhibit purported to show, and after ruling on the objections on each exhibit, the trial court admitted seven— Exhibits 52, 54, 55, 58, 60, 62, and 63. The record before us does not affirmatively show that the trial court refused to conduct a Rule 403 balancing test. Rather, the trial court overruled the Rule 403 objections. We presume the trial court engaged in a balancing test before the court ruled on the objection. *See Williams*, 958 S.W.2d at 195. Furthermore, Rule 403 favors the admission of relevant evidence, and relevant evidence carries a presumption that it is more probative than prejudicial. *See id.* at 196. Miller has failed to overcome the presumption that the evidence was more probative than prejudicial. *See id.* at 195-96.

"We will not overturn a case on a non-constitutional error if, after examining the record as a whole, we have a fair assurance that it did not influence the jury[] or

influenced them only slightly." *Hayes*, 85 S.W.3d at 816 (citing *Schutz*, 63 S.W.3d at 444). In addition to the objected-to autopsy photos, the record includes testimony by Dr. Brown about the nature and extent of James's injuries, the autopsy report, and testimony of other witnesses at the scene who observed that James had lost a leg in the accident. In addition, Appellant's brief concedes that "[t]here was no question that Melisa Ann Miller struck a motorcycle carrying James and Melissa Bradberry and that James Bradberry died as a result of the injuries he sustained [and] that Melissa Bradberry suffered serious bodily injuries as a result of the accident." Considering the weight of other evidence, we conclude that Miller has not established that the admission of the autopsy unduly influenced the jury in its decision, that the admission of the photos affected a substantial right, or that any reversible harm resulted. *See* Tex. R. Evid. 44.2; *Prible*, 175 S.W.3d at 736-37; *Hayes*, 85 S.W.3d at 816. We overrule Appellant's first issue.

## Sufficiency of the Evidence

Appellant's second issue argues that the evidence was legally insufficient to sustain the jury's verdict. Appellant challenges the sufficiency of the evidence that she was intoxicated at the time of the accident based on the testimony of Trooper Lenderman and Dana Baxter. According to Appellant, the only testimony by Lenderman that supported an inference of intoxication was that she performed

26

poorly on the HGN test, which she alleged was performed "in less than ideal conditions[]." Appellant also argues that Baxter testified that the blood levels of carisoprodol and meprobamate were within the therapeutic range.

Applicable Law

We understand Appellant's brief to challenge only whether there was legally sufficient evidence that she was intoxicated and had lost the normal use of her mental or physical faculties. Intoxication is an element of felony murder, where the underlying felony is a felony DWI, and it is an element of intoxication assault. *See* Tex. Penal Code Ann. §§ 19.02(b)(3), 49.07(a)(1).

The State must prove each essential element of an offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). When reviewing the sufficiency of the evidence, we consider all of the admitted evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences from it, a jury was rationally justified in finding the defendant guilty beyond a reasonable doubt. *Id.* Applying the *Jackson* standard, evidence is insufficient in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense

27

charged. *See Brister v. State*, 414 S.W.3d 336, 342 (Tex. App.—Beaumont 2013), *aff'd*, 449 S.W.3d 490 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 314, 318 n.11; *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). The evidence is not legally sufficient if it is based on only speculation. *See Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007).

The jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Jackson*, 443 U.S. at 319. Juries can draw any reasonable inference from the facts so long as each inference is supported by the evidence. *See id.*; *Hooper*, 214 S.W.3d at 16-17. When the record supports conflicting, reasonable inferences, we presume that the jury resolved the conflicts in favor of the verdict. *Jackson*, 443 U.S. at 326.

Legally sufficient evidence need not exclude every conceivable alternative to the defendant's guilt. *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018) (citing *Ramsey v. State*, 473 S.W.3d 805, 811 (Tex. Crim. App. 2015)). The law requires no particular type of evidence: direct and circumstantial evidence are equally probative, and "'circumstantial evidence alone can be sufficient to establish guilt.'" *Id.*; *Hooper*, 214 S.W.3d at 13.

<u>Analysis</u>

Trooper Burman testified that he found a prescription bottle of hydrocodone-acetaminophen and four carisoprodol pills in Miller's purse. He also testified that Miller seemed to be impaired, had slow and deliberate movements, her eyes were glassy and bloodshot, her speech was slurred, and her coordination was "off[.]" In his driver examination report, he wrote that Miller appeared to be under the influence of medication. Trooper Lenderman testified that Miller admitted to him that she had taken two painkiller pills that day and that when he administered the HGN test, Miller exhibited six out of six clues. Baxter testified that her analysis of Miller's blood sample detected carisoprodol, hydrocodone, meprobamate—CNS depressants that have additive effects and can cause drowsiness, mental confusion, and slowed reaction times. Baxter also testified that her analysis detected amphetamine and methamphetamine. Robert Heifner, one of the motorcyclists riding with James and Melissa, testified that Miller appeared intoxicated when he saw her at the scene. Doug Crocker, a passing motorist who stopped at the accident, testified that he spoke with Miller at the scene and her speech was slow. Peggy Samuels, who heard the crash and went to the scene with her husband, testified that Miller left her purse on Samuels's ATV and there were prescription bottles in the purse. Exhibit 73 depicts Miller telling Trooper Lenderman that she took three pain pills that day.

29

Deferring to the jury's determination of the credibility and weight of testimony, we cannot say there is no evidence or only mere speculation that Miller was intoxicated at the time of the accident. *See Hooper*, 214 S.W.3d at 16; *Brister*, 414 S.W.3d at 342. To the degree the record supports conflicting inferences, we presume the jury resolved them in favor of the verdict. *See Jackson*, 443 U.S. at 326. We conclude there is legally sufficient evidence to support the jury's verdict, and we overrule Appellant's second issue.

Having overruled Appellant's issues, we affirm the trial court's judgments.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on February 25, 2020
Opinion Delivered April 29, 2020
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.